Joan IVAN and Angel Jazikoff,
Plaintiffs,

v.

COUNTY OF MIDDLESEX; Middlesex County Sheriff's Department; Sheriff Joseph C. Spicuzzo, individually and in his official capacity as Sheriff of the Middlesex County Sheriff's Department; Undersheriff Angelo Falcone, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department; Lieutenant Donald Blount, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department; Sergeant Bruce Allen, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department; Officer Robert Landis, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department; Officer Alexander Pepenella, individually and in his official capacity as Sheriff's Officer of the Middlesex County Sheriff's Department and John Does 1–10 (fictitious names) individually and in their official capacities as Sheriff's Officers of the Middlesex County Sheriff's Department, Defendants.

Civil Action No. 03–1703 (WHW).

United States District Court,
D. New Jersey.

Jan. 21, 2009.

438

Jeffrey G. Garrigan, Esq., John P. Nulty, Jr., Esq., Cammarata, Nulty & Garrigan, L.L.C., Jersey City, NJ, and for Plaintiffs Joan Ivan and Angel Jazikoff.

Joseph V. Biancamano, Esq., Lawrence F. Citro, Esq., Biancamano & Di Stefano, Edison, NJ, Patrick J. Bradshaw, Esq., Kelso & Bradshaw, Esqs., New Brunswick, NJ, for Defendants Count of Middlesex, Middlesex County Sheriff's Department.

Craig L. Corson, Esq., Hoagland, Longo, Moran, Dunst & Doukas, Llp, New Brunswick, NJ, for Defendant Undersheriff Angelo Falcone.

Lori A. Dvorak, Esq., Marc D. Mory, Esq., Dvorak & Associates, Llc, New Brunswick, NJ, for Defendant Lieutenant Donald Blount.

Michael John Stone, Esq., The Stone Law Group, Warren, NJ, for Defendant Sergeant Bruce Allen.

Clark W. Convery, Esq., Convery, Convery & Shihar, Edison, NJ, for Defendant Officer Robert Landis.

George A. Spadoro, Esq., Keyana Capri Laws, Esq., Wolff & Samson PC, Offices at Crystal Lake, West Orange, NJ, for Defendant Officer Alexander Pepenella.

## OPINION

WALLS, Senior District Judge.

Both plaintiffs and defendants move for summary judgment. Defendants' motions are granted in part and denied in part. Plaintiffs' motion is denied.

### FACTS AND PROCEDURAL BACKGROUND

This matter arises from allegations of sexual harassment and gender discrimination in the Middlesex County Sheriff's Department (the "Department"), where plaintiffs Joan Ivan and Angel Jazikoff served

Peter Ciolino, Esq., Harwood Loyd, Hackensack, NJ, for Mediator.

as sheriff's officers. Plaintiffs charge they were subjected to specific instances of sexual harassment, Ivan by Sergeant Bruce Allen and Jazikoff by sheriff's officer Robert Landis, sheriff's officer Alexander Pepenella and Lieutenant Donald Blount. Both plaintiffs also claim that written policies and customs of the Department constitute unlawful gender discrimination under state and federal law. The relevant facts are as follows.[1]

### Ivan

Ivan was hired in January of 1999 and served as a sheriff's officer until her termination on October 14, 2003. Allen was a sergeant in the Department and, for a time, Ivan's direct supervisor. Allen's harassment often took the form of verbal abuse. Between August and November of 1999 Allen on several occasions, upon observing Ivan smoking on her break, commented as to how "disgusting" Ivan looked, (Certification of John P. Nulty, Jr. (Dkt. No. 150 (filed Apr. 15, 2008)) ("Nulty Cert."), Ex. C, Ivan Dep. 89:6 to 89:13., Dec. 8, 2004.), and requested that she wear her hair up. (Certification of Patrick J. Bradshaw ("Bradshaw Cert."), Ex. I, Ivan Dep. 83:18–84:5.) Although County procedures did require hair to be "neat and clean," (Bradshaw Cert., Ex. I, Ivan Dep. 84:16–21.), Allen added that it was "no wonder [Ivan did not] have a date." (Nul-

ty Cert., Ex. C, Ivan Dep. 92:11 to 92:24.) Ivan never reported these incidents. Another sheriff's officer testified that Allen, in the presence of Ivan, said that Ivan needed a "good stiff fucking," was "sucking her way to the top" and commented that females were useless and had no place in the department. (Nulty Cert., Ex. E, Netta Dep. 44:45–46:15; 48:18–19.)

On November 3, 1999, Ivan expressed interest in attending a military birthday party for veterans who served in the Department. Allen grumbled, "[I] forgot they allow bimbos in the Navy now." Notwithstanding this missive, Ivan insisted that she planned to attend. In response, Allen asserted, "Mark my words. No, you will not." (Nulty Cert., Ex. C, Ivan Dep. 113:21 to 121:14.) Ivan reported this incident to Sgt. Orpen and Lt. Sathan but was advised to simply try to ignore it. (Nulty Cert., Ex. G at ¶¶ 3–4.) On the morning of the party, Ivan was transferred to Transportation Division and Allen chided, "... told you you're not going to be here." (Nulty Cert., Ex. C, Ivan Dep. 116:9–117:8.)

After such transfer Ivan had only limited contact with Allen. (Bradshaw Cert., Ex. I, Ivan Dep. 125:10–20; 127:19–23; 125–1:12.). Ivan testified that she could not recall any harassment occurring between November, 1999 until August, 2000,

---

**1.** Counsel for both parties have expended significant energy on the question of what is properly included in plaintiffs' Statement of Facts, filed with Plaintiffs' Opposition to Defendants' Motion for Summary Judgment. *See* Letter from Jeffrey S. Garrigan, dated as of May 23, 2008 (Dkt. No. 158, filed May 29, 2008); *see also* Letter from Craig L. Corson, dated as of May 29, 2008 (Dkt. No. 159, filed May 29, 2008). The Court knows all too well that a statement of facts, pursuant to Local Rule 56.1, that contains a combination of fact, opinion and legal conclusions presents a significant burden on the Court to determine what facts are disputed by the parties. *Cf.*

*New Jersey Auto. Ins. Plan v. Sciarra,* 103 F.Supp.2d 388, 395 n. 4 (D.N.J.1998). The Court appreciates that defense counsel took the time to clarify plaintiffs' Statement of Facts, which the court agrees in certain instances overstepped the bounds of Local Rule 56.1 by mixing legal analysis and opinion with fact. However, the Court is able to separate fact from opinion and, in considering the present motions, has done just that. The Court also, as it must, accepts the allegations of the non-moving party as fact and reasonable inferences therefrom in defiance of the motion.

(*Id.,* Ivan Dep. 244:21–245:23.), when, after a party to celebrate the retirement of another officer, (hereinafter, the "Galway Retirement Party"), Allen touched Ivan's buttocks and said "Come on baby. You're a tease. Come on. You know you want this. You know you want me." (Nulty Cert., Ex. C, Ivan Dep. 270:19–271:22.) When Ivan failed to respond to these overtures, Allen added "You really are a bitch!" "You aren't a cop, you are a tease!" "Your looks aren't going to get you anywhere in this department!" and "You females are worthless!" (Second Am. Compl. ¶ 64.) Although Ivan was severely distressed by this incident, turning to several officers nearby for assistance in restraining Allen, (Bradshaw Cert., Ivan, Ex. I 283:22–25.), she did not report this incident for over a year, until April 16, 2001.

In December, 2000 or January, 2001, Ivan clashed with Allen again while delivering a prisoner to the criminal courthouse. Transportation officers were not allowed above the basement level but, because the basement women's bathroom was closed by flooding, Ivan went to the first floor to use the bathroom. (Bradshaw Cert., Ex. I, Ivan Dep. 369:6–370:9.) Allen encountered Ivan on the first floor, blocked access to the bathroom and told her to "hold it and get out of his building." (Nulty Cert., Ex. C 383:9–383:16.) Ivan did not report this incident.

On April 16, 2001, Allen witnessed Ivan behind a lieutenant's desk and offered "that's where you should be, behind the desk like a secretary." (Second Am. Compl. ¶ 71.) Later, upon learning that Ivan planned to take her son to Disneyland, Allen offered, "Oh, I can't believe you could reproduce . . . he must be a poor kid to have a mother like you." (Nulty Cert., Ex. C 476:13 to 477:3.) In response to Ivan's request that he stop, Allen retorted

"What? I thought you were one of the guys. What, you can't take it?" (Compl. ¶ 75.)

After this incident Ivan complained about Allen's behavior and on, May 3, 2001, Undersheriff Falcone ordered that there be no contact between the two. (Bradshaw Cert., Ex. I, Ivan Dep. 525:17–22.) Ivan was prohibited from working at the criminal courthouse and was required to notify Allen whenever her other duties required her to be there. (Second Am. Compl. ¶ 83.) Ivan initially expressed satisfaction with this solution but ultimately felt that the policy stigmatized her. (Bradshaw Cert., Ex. I, Ivan Dep. 526:13–18, 593:8–14.) In a final act of harassment, on November 16, 2001, Alteria and Ivan reported to the courthouse to transfer a prisoner and Allen shouted derogatory and gender-based comments across the parking lot in Ivan's direction. (Compl. ¶ 89–92; Nulty Cert., Ex. YY.)

Allen also made other troubling comments, although they were not directed toward Ivan specifically. Sheriff's officer Villegas testified that Allen said "broads don't belong here." (Nulty Cert., Villegas, Ex. F 68:19 to 69:10.) According to the testimony of Sheriff's Officer Alteria, Allen was "more harsh, more critical" of female officers, stated that female officers should not be in law enforcement, and would make comments about the appearance of female officers, including officer Ivan, suggesting that "he would like to see them out of their uniform[s]." (Nulty Cert., Ex. D, Alteria Dep. 69:5–69:14; 69:24–70:7; 70:25–71:15; 74:8–74:22; 220:18–222:11.)

There is some evidence that Allen did not reserve his boorish behavior for his female coworkers. An investigative report concluded that Allen "appear[ed] to have a command management style that ha[d] been variously described as being tough, strong, nasty, bullying, condescending, ar-

rogant, intimidating, that at times [could] be petty, arbitrary or capricious." It also "appear[ed] that he generally treat[ed] male and female officers alike with his abrasive style." (Bradshaw Cert., Ex. F at 10.)

However, on March 26, 2002, Director of Personnel for the County, J. Thomas Cross wrote to Sheriff Spicuzzo indicating his initial finding that Allen's conduct towards Ivan had violated the County's sexual harassment policy. Director Cross recommended that Allen receive sensitivity training and a written reprimand. Despite this recommendation, Allen was not disciplined. Instead Undersheriff Falcone told Allen that Sheriff Spicuzzo had decided not to take any action against him. (Nulty Cert., Ex. JJ at 349:25–350:9.)

### Jazikoff

Plaintiff Jazikoff was first employed as a sheriff's officer in the Department in April of 2000, (Second Am. Compl. ¶ 15.), and continued in that position until her disability retirement on September 8, 2006. (Statement of Facts in Opp'n at 1.) Jazikoff claims direct harassment by three members of the department, Lieutenant Blount and sheriff's officers Landis and Pepenella.

Similarly to Allen's harassment of Ivan, Blount's alleged harassment involved a series of inappropriate comments while he was Jazikoff's supervisor. On March 3, 2003, Blount told Jazikoff she was "going to be fucked all night long." (Second Am. Compl. ¶ 46.) Blount would often ask if Jazikoff's mood was because "she was on the rag" or if it was "that time of the month" and once noted that his ATM PIN number was 6969, apparent reference to the sexual connotation of "69." (Nulty Cert., Ex. J, Jazikoff Dep. 1810:6–12; 1819:24–1821:3.) On another occasion, when Jazikoff was in street clothes, Blount made comments similar to "Oh my God, you look different out of uniform" and

"Your ass looks great in those jeans." (Nulty Cert., Ex. K at ¶ 11.)

Blount also enlisted his authority as Jazikoff's supervisor in his harassment. Once during roll call, Blount ordered Jazikoff to turn around in front of him. (Nulty Cert., Ex. K at ¶ 3.) Other officers were not asked to do the same. (Nulty Cert., Ex. L, Martin Dep. 32:17–34:23; Ex. M, Mayo Dep. 29:3–31:16.) On another occasion, several male officers were looking at magazine depicting, in Jazikoff's words, "provocatively dressed" women. One of the officers asked Blount which one he would "pick." Blount queried in response, "which one looks most like Jazikoff?" (Nulty Cert., Ex. K at ¶ 22; Ex. J, Jazikoff Dep. 797:18 to 798:20.) A few minutes later Blount, claiming to have read the County's sexual harassment policy, said he realized that he was not allowed to say that and amended his comment, "that's not Jazikoff, that's her twin sister." (Nulty Cert., Ex. K at ¶ 22; Ex. J, 802:10 to 805:7.) Finally, while conducting instruction in weapon maintenance, as he applied oil to the barrel of a gun, Blount said "this is the way you have to do it," and "you have to jerk it off hard." (Nulty Cert., Ex. K at ¶ 27.)

Harassment by Landis consisted of both inappropriate comments and physical contact. In the spring of 2001, Landis told Jazikoff, "I feel like bending you over this patrol car and giving you a good one" and "I think you're the kind of girl who likes dirty sex all night." He then feigned moaning while touching himself. (Nulty Cert., Ex. J, Jazikoff Dep. 132:23–134:4.) In response to Jazikoff's complaints about this behavior, Blount said that he was not surprised but that Jazikoff should just ignore it, waiving off the behavior as "Buzzy [Landis] being Buzzy." (Nulty Cert., Ex. K at ¶ 1.) Jazikoff did not formally report this incident. Landis later left a phone

message on Jazikoff's home phone intimating that he and Jazikoff had a date later that evening. Jazikoff's husband heard this message causing some distress. (Nulty Cert., Ex. K at ¶ 6.)

In June or July of 2001, Landis came up behind Jazikoff, pressed his pelvis against her back, picked up a cookie that Jazikoff was eating and smeared it on his face suggestively. He then asked Jazikoff, "Are you hungry? I'll give you something to eat." and added "This is like eating you." Landis then leaned close to Jazikoff and attempted to lick her ear. (Nulty Cert., Ex. K at ¶ 7.) Jazikoff claims that she failed to report this incident for fear of retaliation. (Second Am. Compl. ¶ 23.) On August 31, 2001, Landis called out "Hey Jaz," pulled down his pants and underwear and bent over. (Nulty Cert., Ex. K at ¶ 8.) Jazikoff reported the incident orally to Lieutenant Consalvo. (Bradshaw Cert., Ex. L, Jazikoff Dep. 229:5–21.)

In comparison with the behavior of the other defendants, Pepenella's actions were relatively tame. Jazikoff was partnered with Pepenella in January of 2003. Pepenella attempted to hold her hand, called her his girlfriend, (Nulty Cert., Ex. K at ¶ 18.), and would discuss oral sex. (Nulty Cert., Ex. J 2236:8–22.) Other officers testified that they were not surprised by these actions based on Pepenella's reputation. In answer to Jazikoff's complaints, Blount acknowledged that he had expected Pepenella to harass Ivan. (Nulty Cert., Ex. K ¶ 19.) On February 23, 2003, Blount assigned officer McDermid, allegedly Pepenella's close friend, to replace Pepenella as Jazikoff's partner. Jazikoff claims that McDermid continued to harass her but details only insignificant instances of harassment. (Compl. ¶¶ 44–45.)

### The Atmosphere of the Department

More generally, plaintiffs claim that the atmosphere in the Department was sexual-

ly charged. Adult magazines, like Playboy, and mens' magazines such as Maxim and Easy Rider were common in the Department. (Nulty Cert., Ex. N, McDermid Dep. 78:3–79:18; Ex. L, Martin Dep. 41:5 –43:19; Ex. E, Netta Dep. 49:24–52:21; Ex. M, Mayo 43:1–12; Ex D, Alteria Dep. 114:4–115:23, 117:6–118:18). A list of violent sexual activities, in an apparent attempt at humor, was displayed in the station and Lieutenant Mullen posted pictures of scantily clad women in his office. (*See* Nulty Cert., Ex. Q; Ex. R.)

Several members of the Department also made comments either related to gender or of a sexual nature. Blount referred to his paycheck as being for "cunt number one" and "cunt number two," apparent reference to his two ex-wives. (Nulty Cert., Ex. J 1812:17 to 1813:2.) Allen suggested that Lieutenant Dawn Sidders was a lesbian and, in refusing to allow officer Michelle Kardos to serve at the same time as Sidders, worried that Kardos would "take care of Sidders under the desk." (Nulty Cert., Ex. K at ¶ 2.) According to sheriff's officer Alteria, Landis would make comments about women and spent most of the day looking at their breasts and buttocks while commenting on what they might be like in bed. (Nulty Cert., Ex. D, Alteria Dep. 97:24–100:4.)

### Policies and Customs of the Department

The Department had responsibility for transporting prisoners between the Middlesex County Correctional Facility and the Superior and Municipal Courts within Middlesex County. (Nulty Cert., Ex. V, Expert Report of Francis R. Murphy ("Murphy Report").) Several of the Department's written policies differentiated on the basis of gender. General Order ("GO") 60:4.4 "Arrest Procedures" required that female officers search female prisoners and male officers search male prisoners whenever practicable. (Murphy

Report at 6.) While Department policy acknowledged that the law might not require this differentiation, GO 70:4.1 concluded that "common sense" suggested searches of female prisoners by male officers be avoided. GO 6:11.2 "Processing Female Prisoners" required that female prisoners be searched and transported by female officers when possible and other GO also reflected this policy. (Murphy Report at 7–9.)

Unwritten policies of the department differentiated based on gender as well. Custom did not allow female officers to work as partners, (Murphy Report at 10–11.), and required a female sheriff's officer on duty for each of the Department's three shifts. (Murphy Report at 11.) The need to have female officers available for transports and searches resulted in other differential treatment. First, Sheriff Spicuzzo conceded that gender played a role in determining how posts were filled and that female officers who were more qualified than male officers had been denied opportunities. (Nulty Cert., Ex. X, Spicuzzo Dep. 63:24–64:18.) As example, Jazikoff did not receive training that other officers received purportedly because she would be limited to working in the Transportation Division. (Nulty Cert., Ex. K ¶ 4.)

Second, the Department maintained a separate mandatory overtime list so that there would be sufficient female officers to satisfy the search and transportation policies. (Nulty Cert., Ex. Y, Sathan Dep. 57:9–58:5.) Both Falcone and Spicuzzo acknowledged that female officers worked more hours because of this policy, (Nulty Cert., Ex. X, Spicuzzo, 226:19–227:12.; Ex. W, Falcone Dep. 75:22–76:16.), and would often be held over after hours. (Nulty Cert., Ex. J, Jazikoff 652:23–653:12; 669:22–670:23.) Additionally, unlike male officers, female officers exerted no more control over their schedule as they gained

seniority. (Murphy Report at 15.) Jazikoff often worked double shifts and hours of forced overtime to ensure that a female officer was available. (Nulty Cert., Ex. J, Jazikoff Dep. 357:5–358:21.) Both Spicuzzo and Falcone testified that the policy was justified by a desire to avoid allegations of sexual harassment. (Nulty Cert., Ex. W, Falcone Dep. 92:5 to 93:1, Ex. X, Spicuzzo Dep. 208:6 to 210:13.)

### Sexual Harassment Policy

The County had promulgated a sexual discrimination policy. The policy was distributed to all County agencies, of which the Department was one. Every employee was supplied with a copy and training in the policy was supplied. (*See* Bradshaw Cert., Ex. C; Ex. D; Ex. E.) However, Plaintiffs introduced evidence that the policy was unevenly enforced and that the Department failed to effectively implement the policy. The very people who were charged with enforcement often committed violations. Plaintiffs also claim that the Department failed to investigate complaints adequately. Ivan's complaint about Allen was not investigated in a timely fashion.

The anti-harassment policy mandated that investigations be completed within 30 days "but in no event shall exceed 45 working days ... without consent or compelling circumstances", (Nulty Cert., Ex. EE, 1:28–5(E)(5).), but the investigation into Ivan's allegations was not completed for over 10 months. (Nulty Cert., Ex. II, Alai Dep. 73:8–18.) Even though the investigation ultimately concluded that Allen violated anti-harassment policy and recommended sensitivity training, punishments were not imposed, nor did Director Cross have the power to impose punishment. (Nulty Cert., Ex. JJ, Allen Dep. 349:25–350:20; Ex. BB, Cross Dep. 83:8 to 85:6.) After Jazikoff disclosed her complaints about Landis to Holly Alai of County Per-

sonnel, Alai informed Undersheriff Falcone of Jazikoff's complaint even though the sexual harassment policy required confidentiality. (Nulty Cert., Ex. EE, 1:28–8.) Falcone then berated Jazikoff for her complaint. (Nulty Cert., Ex. K, ¶ 11.)

Although Jazikoff never formally complained about Pepenella and Blount, an investigation was conducted in response to her informal complaints. This investigation ultimately focused only on Pepenella and the Magazine Incident and Alai based the report solely on interviews with Falcone, Pepenella and McDermid. (Nulty Cert., Ex. CC, Alai Dep. 107:16–21.) Alai failed to interview sheriff's officer Martin who could have testified not only as to Pepenella's actions but also that Jazikoff had complained to Blount about Pepenella, (Nulty Cert., Ex. L, Martin Dep. 101–104:7.), and misrepresented information provided by McDermid. (Nulty Cert., Ex. MM.) Alai's report on the magazine incident accepted events as described in Falcone's memorandum and again contained misrepresentations. (*Id.*)

### Retaliation

Both Jazikoff and Ivan further assert that they were subjected to retaliation for complaining about harassment. Ivan claims first that she was retaliated against via the stigmatization of the separation order, the incident involving the courthouse bathroom, threats by Falcone that future complaints would result in reprisals and other minor incidents of harassment. (Nulty Cert., Ex. G ¶ 11.) Ivan complains second that, in response to her EEOC charges and federal complaint, she was inappropriately brought up on charges for failing to report her partner for smoking in their patrol car (the "Smoking Incident") and provided treatment different from her peers in her firearm qualification and as a result ultimately terminated. (*See* Nulty Cert., Ex. X, Spicuzzo Dep.

348:2–14; *see also* Ex. AAA; Ex. BBB) Ivan brought an administrative appeal of both of these purported reprisals. Office of Administrative Law Judge Blake found that Ivan's termination was justified by her failure to qualify on her firearm but that Ivan's punishment for failure to report the Smoking Incident was the product of Sheriff Spicuzzo's "personal animus" toward Ivan. (Nulty Cert., Ex. CCC.)

Jazikoff's allegations of retaliation are more general. In September 2001, Jazikoff submitted complaints regarding harassment by Landis, the incident involving the cookie and mooning incident. (Nulty Cert., Ex. QQ.) On October, 16, 2001, Jazikoff appeared at a hearing and later met with Alai. On October 23, 2001, Jazikoff was informed that she was being brought up on disciplinary charges relating to the mooning incident. (Nulty Cert., Ex. K at ¶ 11.) Although no formal charges were ultimately declared against Jazikoff, they were asserted against the other officers present. (Bradshaw Cert. at xxvi, Ex. M; Ex. N & Ex. O.) Jazikoff also claims that she was blocked from employment with the Sayreville Police Department in response to the incident. (Bradshaw Cert., Ex. P.) Around the same time, Falcone stated to Jazikoff, "I've been through this sexual harassment bullshit before with charges against me" and "[y]ou think you females can go against us? You think you might have a case? Try it, go for it. You will never ever win. No jury would ever find me or my department guilty of this female bullshit." (Nulty Cert., Ex. K at ¶ 11.) In November and December of 2002, Jazikoff was denied timely requests for vacation and personal days. Finally, in response to Jazikoff's complaints about Pepenella's harassment, Blount partnered Jazikoff with McDermid, although Blount knew that McDermid had disdain for Jazikoff. (Nulty Cert., Ex. K

¶¶ 22; 24.) After the magazine incident, Blount told Jazikoff "Now we're even." (Nulty Cert., Ex. K ¶ 22.)

On April 11, 2003, Jazikoff filed her EEOC charge. From May, 2003 to November, 2003, Jazikoff was out on medical leave. (Nulty Cert., Ex. J, Jazikoff Dep. 574:15–575:13.) Upon Jazikoff's return she was singled out as "house bitch"[2] and given significant amounts of filing work in the basement. The basement was not a pleasant assignment, (Nulty Cert., Ex. N, McDermid Dep. T38:7–25.), and was regarded as a punishment. (Nulty Cert., Ex. L, Martin T55:5–56:9.) Jazikoff alleges a number of other reprisals, including taunting and other harassment by coworkers, refusals to accommodate sick leave, Undersheriff Falcone's ordering movement of Jazikoff's workspace and files, premature clearance of Jazikoff from medical leave, threats of discipline for marginal infractions, denial of shift change requests, and a lack of accommodation for family emergencies. (*See, e.g.,* Nulty Cert., Ex. K. ¶¶ 32–33, 45–47, 50, 52, 54, 60; Ex. UU; Ex. WW.)

### Complaints

On April 16, 2003, plaintiffs filed their complaint in this Court. (Dkt. No. 1 (filed Apr. 16, 2003).) Plaintiffs set forth eight causes of action pursuant to the New Jersey Law Against Discrimination (the "LAD"). (*Id.*; *See* N.J.S.A. 10:5–1 et seq.) In Counts One and Two, plaintiffs alleged a hostile work environment. In Counts Three and Four plaintiffs alleged that the County and Department, by and through employees, engaged in a pattern and practice of unlawful sexual discrimination. At Count Five Ivan alleged that Spicuzzo, Falcone, Blount and Allen were individually liable to Ivan for aiding and abetting violations of the LAD. Count Six alleged that Spicuzzo, Falcone, Blount, Landis and Pepenella were similarly individually liable to Jazikoff. At Counts Seven and Eight, plaintiffs alleged retaliation in violation of the LAD.

Plaintiffs set forth six federal claims as well. Counts Nine and Ten alleged equal protection violations, Counts Eleven and Twelve, unconstitutional retaliation and Counts Thirteen and Fourteen, unconstitutional conspiracy.

On January 8, 2004, plaintiffs filed their Amended Complaint, adding Count Fifteen, on behalf of plaintiff Ivan, for retaliation in violation of the Conscientious Employee Protection Act ("CEPA") (Dkt. No. 10 (filed January 8, 2004); *N.J.S.A.* 34:19–1 et seq.) On November 16, 2007, plaintiffs filed a Second Amended Complaint, adding Counts Sixteen and Seventeen on behalf of plaintiff Jazikoff, alleging failure to accommodate a disability in violation of both the American with Disabilities Act, 42 U.S.C. 12101 and the LAD. On January 22, 2008, plaintiff Jazikoff filed a Voluntary Stipulation of Dismissal without prejudice as to these last two counts.[3]

Plaintiffs seek compensatory and punitive damages. Additionally, plaintiffs seek injunctive relief against the department to cease the alleged discrimination, placement of Department in receivership for pur-

---

**2.** Department custom was to designate any non-partnered or "odd" officer to be "House Bitch." (Nulty Cert., Ex. K at ¶ 5; Ex. M 35:11–22.) Despite its allegedly derogatory name, officer May testified that "basically it was kind of cool to be the HB; you sat around and did nothing. You got the lieutenant coffee. If he wanted dinner, you got him dinner, and do [sic] paperwork." (Nulty Cert., Ex. M, Mayo Dep. 35:11–22.)

**3.** Defendants also make a series of cross-claims among themselves. As these cross-claims are not the subject of any pending motions the Court does not address them here.

poses of instituting an education program, appointment of an independent consultant to develop anti-harassment policies and re-instatement of both Ivan and Jazikoff.

### Motions

Defendants have made a series of motions for summary judgment. Defendant the County of Middlesex has moved for summary judgment on any claims for acts of harassment occurring before Ivan and Jazikoff started working at the Department. (Dkt. Entry Nos. 125 & 126 (filed January 15, 2008).) Defendants the County, the Department and Sheriff Spicuzzo have moved for summary judgment with regard to Counts One through Six. (Dkt. Entry No. 134 (filed January 31, 2008).) Defendant Blount has moved for summary judgment with regard to Counts Seven, Eleven, Thirteen, Fourteen and Fifteen. (Dkt. Entry No. 138 (filed January 31, 2008).) Defendant Falcone has moved for summary judgment with regard to Counts Seven, Eight, Nine, Ten and Twelve (Dkt. Entry No. 139 (filed January 31, 2008).) All defendants have joined in each of these motions. (Dkt. Entry Nos. 131–33; 135; 137; 140 (filed January 31, 2008); Dkt. Entry No. 141 (filed February 1, 2008).) For their part, plaintiffs have moved for summary judgment with regard to Count Fifteen. (Dkt. Entry No. 136 (filed January 31, 2008).)

### LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-moving party, and it is material if, under the substantive law, it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). To survive a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence in his favor. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. In doing so, the court must construe the facts and in-

ferences in the light most favorable to the non-moving party. *Id.* at 255, 106 S.Ct. 2505; *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir.2002).

## DISCUSSION

### *Acts Occurring Before Plaintiffs' Respective Terms of Employment*

Defendants move for summary judgment on any claims arising from acts of harassment directed at Jazikoff and Ivan that occurred before Jazikoff and Ivan were employed by the Department, in January 2000 and July 1999, respectively. Defendants' counsel certifies that plaintiffs have not asserted any such claims. (Defs.' Motion for Partial Summ. J., Certification of Lawrence F. Citro, Esq., Statement of Undisputed Facts ¶¶ 5–6 (Dkt. No. 125, filed Jan. 10, 2008); Defs.' Motion for Partial Summ. J., Certification of Lawrence F. Citro, Esq., Statement of Undisputed Facts ¶¶ 5–6 (Dkt. No. 126, filed Jan. 10, 2008) (collectively "Citro Cert.").) Plaintiffs do not dispute the dates that Jazikoff and Ivan began working for the Department but do contest defendants' assertion that any such acts are irrelevant to determination of plaintiffs' liability. Plaintiffs further assert that defendants cannot request dismissal of claims which they simultaneously certify have not been asserted by plaintiffs.

It is undisputed that Jazikoff and Ivan have not asserted any claims for harassment based on acts committed before the beginning of their respective terms of employment. (*See* Citro Cert.) Yet alleged acts of harassment occurring before Jazikoff and Ivan worked in the Department could be relevant to a hostile work environment claim because they might tend to establish that the County and Department knew of harassment in the Department. If the Department or County were negligent or reckless with regard to such harassment they could be liable for com-pensatory or punitive damages. *See Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 620, 626 A.2d 445 (1993); *see also* Restatement (Second) of Agency § 218(d). The County's motion must be denied.

### *LAD Claims*

#### 1. Statute of Limitations

Defendants argue that any of plaintiffs' claims under the LAD for events that occurred before April 16, 2001 are time barred. Plaintiffs argue that, under the "continuing violation doctrine," their claims are timely because acts are part of a pattern of discrimination.

#### a. Standard

 Under the "continuing violation doctrine," a plaintiff "may pursue a claim for discriminatory conduct if he or she can demonstrate that each asserted act by a defendant is part of a pattern and at least one of those acts occurred within the statutory limitations period." *Shepherd v. Hunterdon Developmental Ctr.,* 174 N.J. 1, 6–7, 803 A.2d 611 (2002) (citing *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754–55 (3d Cir.1995)). "When an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." *Shepherd* at 18, 803 A.2d 611 (quoting *Wilson v. Wal–Mart Stores,* 158 N.J. 263, 272, 729 A.2d 1006 (1999)). Hostile work environment claims differ from discrete acts like failure to promote, denial of transfer, or refusal to hire. *Shepherd* at 18–20, 803 A.2d 611 (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114–18, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Because hostile work environment claims arise from cumulative harassment they fit readily into the continuing violation theory. *See Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481 (3d Cir.1997). As long as an act that

contributes to a hostile work environment occurred during the statutory period it does not matter that some of the component acts occurred outside the statutory period. *Id.*

█ On the other hand, such acts must be more than just isolated or sporadic incidents of harassment. *Bolinger v. Bell Atl.,* 330 N.J.Super. 300, 307, 749 A.2d 857 (App.Div.2000); *Beck v. Tribert,* 312 N.J.Super. 335, 346, 711 A.2d 951 (App. Div.1998). Discrete discriminatory acts are time barred even if they are somewhat related to acts alleged in a timely fashion. *Morgan,* 536 U.S. at 113, 122 S.Ct. 2061; *Sgro v. Bloomberg,* 2008 WL 918491, *6, 2008 U.S. Dist. LEXIS 27175, *14–15, No. 05–731(FLW) (March 31, 2008, D.N.J.).

The Third Circuit has adopted a three-factor test published by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971 (5th Cir. 1983), *aff'd,* 783 F.2d 1270 (5th Cir.1986). *See Rush,* 113 F.3d at 481.

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuous violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.,* 715 F.2d at 981.

*b. Analysis*

█ Defendants filed their federal complaint on April 16, 2003. The statute of limitations on sexual harassment claims under the LAD is two years. *See Montells v. Haynes,* 133 N.J. 282, 627 A.2d 654 (1993). Any claims for acts occurring before April 16, 2001 are time barred unless the continuing violation doctrine applies. Many of the events underlying Ivan's claim occurred before April 16, 2001, including Allen's comments between August and November of 1999 that Ivan looked "disgusting," comments in connection with the military birthday party, his behavior at the Galway retirement party and the courthouse bathroom incident. But harassment of Ivan continued after April 16, 2001. In May, 2001, Undersheriff Falcone instituted the separation order and, on November 16, 2001, Allen shouted derogatory language at Ivan. The harassment, with incidents spanning all four years of Ivan's employment, were sufficiently frequent and similar in subject matter to constitute a pattern. Each incident of harassment of Ivan was perpetrated by Allen and was gender- or sex-related. Additionally, none of the acts alleged were permanent or discrete enough to put Ivan on notice to assert her claim. The Court is convinced that these incidents may be considered by the fact finder part of a pattern of discrimination sufficient to constitute a continuing violation. Accordingly, Ivan's claims are timely.

The majority of the harassment directed at Jazikoff happened during the statutory period. In any event, Jazikoff, similarly to Ivan, alleges harassment before April 16, 2001 that is not only related in subject matter but also conducted by the same parties who engaged in harassment after such date. Harassment by Landis beginning in the spring of 2001, as well as harassment by Blount and Pepenella continued well into the statutory period.

Defendants, in arguing that any events occurring before the statutory period were

discrete, point to two cases where courts found that events falling outside the statutory period were not part of a continuing pattern. (Defs.' Reply 11 (citing *Cortes v. Univ. of Med. & Dentistry*, 391 F.Supp.2d 298 (D.N.J.2005)); *Hall (Estate of Potoczak) v. St. Joseph's Hosp.*, 343 N.J.Super. 88, 104, 777 A.2d 1002 (App.Div.2001)).

Both *Cortes* and *Hall* can be distinguished from this case. In *Cortes*, the discriminatory acts occurring before the statutory period were committed by different parties and were topically unrelated. The acts of harassment found commonality only in that they were directed at the plaintiff. *See Cortes*, 391 F.Supp.2d at 308–09. Here, earlier acts bear a much stronger connection to those that happened during the statutory period. Unlike *Cortes*, many of the acts of discrimination before the statutory period were performed by the same parties who continued to harass plaintiffs later. Moreover, all of the harassment of Ivan and Jazikoff related to the same subject matter, sex or gender. *See Berry*, 715 F.2d at 981.

*Hall* can be distinguished because it involved a discrete act of discrimination that put plaintiff on notice to take action. *See Hall*, 343 N.J.Super. at 104–105, 777 A.2d 1002. The Hall plaintiff had been denied an interpreter. *Id.* The court held that the continuing violation doctrine did not apply because plaintiff could reasonably have known that act was discriminatory and brought suit at the time of the first act of discrimination. *Id.* In contrast, plaintiffs have alleged a hostile work environment based on a series of comments and actions that form a pattern. This type of claim fits readily into the continuing violation doctrine. *See Rush*, 113 F.3d at 481. Plaintiffs' claims under the LAD are not barred by the statute of limitations.

### 2. Counts One & Two: Hostile Work Environment

■ At Counts One and Two, plaintiffs seek equitable relief and compensatory and punitive damages based on a hostile work environment. As an initial matter, defendants argue that summary judgment is appropriate with regard to any individual liability under the LAD of defendants Spicuzzo, Falcone, Blount, Allen, Landis and Pepenella because the LAD does not impose individual liability on co-employees. *See Tyson v. CIGNA Corp.*, 918 F.Supp. 836, 839–40, n. 4 (D.N.J.1996). Plaintiffs have abandoned any such claims against Pepenella and Landis. (Pls.' Opp. 71 n. 10.) Spicuzzo, Falcone, Blount and Allen as supervisors, can only be individually liable under the LAD to the extent that they aided and abetted violations of the LAD while acting with the scope of their employment. *See Tyson*, 918 F.Supp. at 839–40, n. 4. Plaintiffs' claims for aiding and abetting are addressed below. All claims against Pepenella and Landis under the LAD, and all claims against Spicuzzo, Falcone, Blount and Allen individually under Counts One and Two, are dismissed. The actions of the individual defendants can still form the basis of liability for the County and/or the Department if they contributed to a hostile work environment.

#### a. *Standard*

■ "To state a claim for hostile work environment sexual harassment, a female plaintiff must allege conduct that occurred because of her sex and that a reasonable woman would consider sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment." *Lehmann*, 132 N.J. at 603, 626 A.2d 445. Plaintiffs must show that "the complained-of conduct (1) would not have occurred but for [her] gender; and it

was (2) severe or pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Id.* at 603–04, 626 A.2d 445.

■ A plaintiff must show only that a reasonable woman would believe that conditions have been altered, *Baliko v. Inter'l Union of Operating Eng'rs*, 322 N.J.Super. 261, 277–78, 730 A.2d 895 (App. Div.1999), not that there were tangible adverse changes or the loss of a tangible benefit. A plaintiff may meet her burden via evidence that other women in the workplace were harassed. *Lehmann* at 610, 626 A.2d 445. Plaintiff need not personally have been the target of each *or any* instance of offensive or harassing conduct. *Lehmann* at 611, 626 A.2d 445. As example, if discriminatory statements were made in the presence of another supervisor, a reasonable juror could conclude that the target of such comments would perceive the working environment as hostile and abusive. *See Taylor v. Metzger,* 152 N.J. 490, 506–07, 706 A.2d 685 (1998).

■ In determining whether plaintiff has adduced evidence sufficient to establish an objectively hostile or abusive work environment, the court must examine the "totality of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hargrave v. County of Atlantic,* 262 F.Supp.2d 393, 413 (D.N.J. 2003) (citation omitted).

### b. *Analysis*

The present inquiry is limited to whether the plaintiffs have produced sufficient evidence to support a hostile work environment claim against the Department and the County, not as against any individual defendant. None of the individual employees of the Department can be individually liable except the supervisors Spicuzzo, Falcone, Blount and Allen and even then only to the extent that they aided and abetted the harassment. Although the evidence with regard to any one employee may be thin, each individual incident of harassment can support plaintiffs' larger hostile work environment claim against the Department and County even if the individual allegation could not support a claim on its own. It is not necessary for the Court to examine whether each incident of harassment standing alone could support a hostile work environment claim. Be that as it may, the evidence is sufficient for both plaintiffs to survive this motion for summary judgment.

### i. *Ivan*

■ With regard to Ivan, defendants argue that plaintiffs have failed to meet the severe or pervasive threshold. According to defendants, the incidents alleged are isolated and, at worst, annoying. Plaintiffs argue that, when viewed in the "totality of the circumstances," the record shows severe or pervasive harassment.

■ The severe or pervasive standard is disjunctive. *See Lehmann* at 606, 626 A.2d 445. The severity or seriousness required varies inversely with the pervasiveness. *See Lehmann* at 607, 626 A.2d 445.[4]

---

4. *Lehmann* expressly rejected the *Andrews* court's "regular *and* pervasive" standard. *See Lehmann* at 606, 626 A.2d 445 (emphasis added). Defendants cite *Andrews* for the proposition that conduct must be "severe enough to affect the psychological stability of a minority employee." (Def.'s Supp. 5–6. (citing *Andrews v. City of Phila.,* 895 F.2d 1469, 1482 (3d Cir.1990)).) It is not entirely clear if the *Lehmann* court abandoned this character-

One particularly severe comment could be enough to meet the standard. *See Taylor*, 152 N.J. at 502–503, 706 A.2d 685 (holding that one reference to employee as "jungle bunny" by a supervisor could support a hostile work environment claim).

 It is the *"harassing conduct* that must be severe or pervasive," not its effect. *See Lehmann* at 606, 626 A.2d 445 (emphasis in original). However, the court must consider cumulative effect, keeping in mind "that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." *Lehmann* at 607, 626 A.2d 445. Even where a plaintiff testifies that incidents occurred "every so often," the cumulative effect of incidents may be enough to satisfy this prong. *Woods–Pirozzi v. Nabisco Foods*, 290 N.J.Super. 252, 271, 675 A.2d 684 (App.Div.1996).

 There is a limit to these inferences. However, "simple teasing, offhand comments, and [non-serious] isolated incidents" do not meet the bar. *See Hargrave*, 262 F.Supp.2d at 413 (quoting *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 280 (internal quotations omitted)). "What is illegal is a 'hostile work environment' not an 'annoying work environment.'" *Lynch v. New Deal Delivery Service*, 974 F.Supp. 441, 452 (D.N.J.1997) (Walls, J.) (holding that no reasonable jury could conclude that behavior was severe or pervasive when supervisor had made several phone calls to plaintiff at night; invited plaintiff to workout, have dinner and divulged that his marriage was falling apart; made comments about having to fire a secretary who was "too pretty"; and where plaintiff had seen a supervisor "put his hands on women").

 When an act is done by a supervisor its severity may be exacerbated because the supervisor has a unique role in shaping the work environment. *See Taylor*, 152 N.J. at 502–06, 706 A.2d 685; *see also Flizack v. Good News Home for Women, Inc.*, 346 N.J.Super. 150, 160, 787 A.2d 228 (App.Div.2001); *see also Leonard v. Metropolitan Life Ins. Co.*, 318 N.J.Super. 337, 345, 723 A.2d 1007 (App.Div.1999) ("the severity of the remarks was underscored by the fact that they were uttered by plaintiff's supervisor").

Ivan has produced sufficient evidence for a fact finder to determine that Allen's conduct was severe or pervasive. As detailed earlier, starting in November of 1999 and continuing until 2001, Allen made a series of comments to and about Ivan that were either gender-based or facially sexual. To be sure, certain of the incidents, if viewed on their own might be insufficient satisfy *Lehmann.* As example, Allen's comments to Ivan regarding her appearance, while perhaps mean-spirited, could be viewed as instructions to a subordinate to comply with the Department's policy. In contrast, other incidents, in particular Allen's comments to officer Netta that Ivan needed a "good stiff fucking" and was "sucking her way to the top," his behavior at the Galway retirement party, his comments about Ivan's son and other comments that expressed his views as to Ivan's proper gender role are much more

ization of the severity required but the *Lehmann* court did make clear that "it is the harassing conduct that must be severe or pervasive, *not its effect* on the plaintiff or on the work environment," *Lehmann* at 606, 626 A.2d 445 (emphasis added), and that "employees need not endure sexual harassment until their psychological well-being is seriously affected to the extent that they suffer anxiety or debilitation." *Lehmann* at 610, 626 A.2d 445 (citing *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.1991)).

severe. Importantly, many of these more severe incidents are also facially sexual.

Because the alleged incidents are so severe they need be less pervasive. *See Lehmann* at 607, 626 A.2d 445. Even if they were less severe, when Allen's behavior is viewed in the "totality of the circumstances," the incidents alleged would be sufficiently pervasive. Plaintiff alleged a significant number of incidents occurring over the course of four years. The Court will not read the LAD to require more to survive summary judgment as a matter of law.

Defendants rely on *Morales–Evans v. Administrative Office of the Courts of New Jersey*, 102 F.Supp.2d 577 (D.N.J.2000) to argue that the acts that plaintiff relies upon are not related by either temporal proximity or subject matter. In *Morales–Evans*, however, the allegations of sexual discrimination were both less severe and less pervasive than the allegations in this case. *C.f. Morales–Evans* at 589. The plaintiff's claims in *Morales–Evans* were limited to unwanted romantic advances from a co-worker before her employment; four or five unwanted kisses on the cheek; a remark that another office staffer who had tried to kiss plaintiff probably couldn't help himself because plaintiff was "so voluptuous" and that he was probably attempting to get his tongue in plaintiff's "gap"; two comments relating sneezing and sexual intercourse; and comments about a visit to a nude beach. *Morales–Evans* at 581–83, 589–90. While these allegations are arguably offensive, none rises to the level of Allen's comments to Ivan that she was "sucking her way to the top" or his conduct at the Galway retirement party.

 Defendants also suggest that plaintiffs have failed to show that harassment was because of Ivan's gender, arguing, in effect, that Allen engaged in equal opportunity harassment. To satisfy the first prong of *Lehmann*, a plaintiff must "show by a preponderance of the evidence that she suffered discrimination because of her sex." *Lehmann* 132 N.J. at 604, 626 A.2d 445; *Woods–Pirozzi*, 290 N.J.Super. at 266, 675 A.2d 684. What "is required is a showing that [plaintiff's] gender was a substantial factor in the harassment, and that if the plaintiff had been [male] she would not have been treated in the same manner." *Hargrave*, 262 F.Supp.2d at 412 (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir.1996)). Accordingly, if the party who committed the allegedly discriminatory act is equally crude to all employees there is no basis for a LAD claim. *See Lehmann*, 132 N.J. at 604, 626 A.2d 445; *See e.g., Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340 (7th Cir.1999) (general mistreatment not motivated by sex or race because plaintiff was not singled out for abuse); *Boyce v. New York City Mission Society*, 963 F.Supp. 290 (S.D.N.Y.1997) (yelling, cursing, belittling of plaintiff's doctoral degree, assigning secretarial duties, indicating she was not liked and pounding on office door were not related to gender).

 Where the conduct is "sexual or sexist in nature" this prong is automatically satisfied. *See id.* at 605, 626 A.2d 445; *See e.g., Woods–Pirozzi*, 290 N.J.Super. at 270, 675 A.2d 684 (comments about "getting lucky", "douche", and "PMS" facially sex-related). "Sexually derogatory language" is recognized as gender-based harassment as a matter of course. *See Hargrave*, 262 F.Supp.2d at 414 (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 n. 3 (3d Cir.1990)). But if incidents are "not obviously based on victim's sex" the victim must make prima facie showing that harassment was because of the victim's sex. *See Lehmann*, 132 N.J. at 605, 626 A.2d 445 (citing *Muench*, 255 N.J.Su-

per. 288, 605 A.2d 242 (holding non-sexual harassment constituted sexual discrimination)). A plaintiff might meet this burden by showing that facially non-sexual conduct was accompanied by harassment that was obviously sex-based, *See id.* at 605, 626 A.2d 445; *see e.g., Woods–Pirozzi*, 290 N.J.Super. at 270, 675 A.2d 684 (reasonable jury could conclude that throwing a softball near victim's head was sexual harassment when viewed in light of other sexual comments), or by demonstrating that only women suffered such harassment. *See Lehmann*, 132 N.J. at 605, 626 A.2d 445, *see e.g., Shope v. Board of Supervisors*, 1993 WL 525598, 1993 U.S.App. LEXIS 33058 (4th Cir.1993) (evidence that other women suffered discrimination and that defendant did not have similar problems with men supported finding of hostile work environment).

If Allen had harassed everyone equally without regard to gender, Ivan's hostile work environment claim would fail. *See Lehmann*, 132 N.J. at 605, 626 A.2d 445. But several of Allen's comments were gender-based. It is of no import that some of these offensive or obnoxious comments were made to parties other than Ivan. Where the conduct is "sexual or sexist in nature" the "but for" prong is automatically satisfied. *See id.* at 605, 626 A.2d 445; *see e.g., Woods–Pirozzi*, 290 N.J.Super. at 270, 675 A.2d 684.

### *ii. Jazikoff*

Defendants make similar arguments with regard to Jazikoff and, again arguing that the actions of defendants are discrete, isolated events, attempt to treat each of the incidents individually. The Court views the totality of the circumstances, and considers the cumulative effect of each individual incident, keeping in mind "that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." *Lehmann* at 607, 626 A.2d 445 (internal citation omitted). When viewed collectively, it is clear that Jazikoff has offered sufficient evidence to survive summary judgment.

Even if the Court were to accept defendants' position, in essence that three incidents of harassment over the course of a year by the same party are discrete and isolated, the severity of the underlying incidents would be sufficient to satisfy *Lehmann.*

■ Jazikoff alleges harassment by Blount, Landis and Pepenella. While Jazikoff's allegations against Pepenella are the thinnest, all three made overtly gender-based comments or overt sexual acts. The allegations against Landis include facially sexual comments made directly to Jazikoff, the cookie and mooning incidents. Even if, as defendants suggest, "mooning" is not a sexual act in certain circumstances, *See e.g. Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1010 (7th Cir.1999); *U.S. v. Choate*, 32 M.J. 423, 427 (U.S.C.M.A.1991); *In re Dallas W.*, 85 Cal.App.4th 937, 102 Cal.Rptr.2d 493 (2d App.Dist.2000), because the other actions by Landis were facially sexual, a reasonable juror could readily conclude that the mooning had a sexual connotation. The cases cited by defendant in support of its assertion that mooning is not sexual are consistent with this approach. While each case refused to hold that mooning was *per se* sexual, the court in each case looked to the context in which the act was done. As the *Shepherd* court noted, "[w]hether the sexual content of the harassment is indicative of sex discrimination must [ ] be examined with attention to the context in which the harassment occurs." *Shepherd* at 1010–11.

The allegations against Blount include telling Jazikoff, in the course of demonstrating how to clean a weapon, that she

had to "jerk it off"; comments about Jazikoff's appearance, the Magazine Incident and a Department custom, perpetuated by Blount, of designating the officer without a partner the "house bitch". Defendants argue that these allegations are insufficient to support her LAD claim because they are not sexual in nature. A reasonable juror could readily conclude that the comment about the weapon was sexual in nature when considered in the context of Blount's other facially sexual comments. Similarly, although defendants argue that the Magazine Incident was not severe, when viewed with the other comments made to Jazikoff, by both Blount and others, a reasonable juror could conclude that the comments were severe enough to satisfy *Lehmann.* This is especially true because Blount was Jazikoff's superior. *See Taylor,* 152 N.J. at 502–06, 706 A.2d 685; *see also Flizack,* 346 N.J.Super. at 160, 787 A.2d 228; *Leonard,* 318 N.J.Super. 337, 345, 723 A.2d 1007 (App.Div.1999).

■ Defendants argue that gender-neutral insults, like "house bitch" do not satisfy the "but for standard" and that, because the custom was not directed at Jazikoff, it is not the proper subject of an LAD claim. Comments need not be directed toward plaintiff in order to support an LAD claim. It is enough that Jazikoff heard the comments. *Lehmann,* 132 N.J. at 611, 626 A.2d 445. An LAD hostile work environment claim may properly rely on evidence that other women were sexually harassed. *Id.* It follows that, if the "house bitch" custom constitutes harassment, it could form the basis of Jazikoff's claim whether or not the comment was directed at her specifically.

Not all words that have some sexual connotation constitute discrimination because of sex. Courts have held that the word "bitch" is not necessarily sexual in nature. *See e.g., Reyes v. McDonald Pon-*

*tiac–GMC Truck, Inc.,* 997 F.Supp. 614, 617–18 (1998) (holding that, although defendant referred to plaintiff as "miss f* * * * * * Queen Bee" and "bitch", such comments were not because of plaintiff's gender); *Hedberg v. Rockford Stop–N–Go,* 202 F.3d 273, 1999 WL 1100303, *2, 1999 U.S.App. LEXIS 32026, *6 (7th Cir. 1999) ("white bitch" not necessarily motivated by plaintiff's sex because there is no automatic inference of sexual discrimination solely from the word "bitch"). "It is true that "bitch" is rarely used of heterosexual males ... but it does not necessarily connote some specific female characteristic, whether true, false, or stereotypical; it does not draw attention to the woman's sexual or maternal characteristics or to other respects in which women might be thought to be inferior to men in the workplace, or unworthy of equal dignity and respect. In its normal usage, it is simply a pejorative term for "woman." " *Reyes* at 618 (quoting *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1168 (7th Cir.1996)) In contrast, comments that are focused on gender will meet the *Lehmann* standard. *Shope v. Board of Supervisors,* 1993 WL 525598, *1–2, 1993 U.S.App. LEXIS 33058, *4–5 (4th Cir. 1993) (comments like "shouldn't be such a soft woman", "too aggressive a woman", "stupid woman", "if you're a weak woman and you've got mental problems, then you just let somebody else come in here and do this job" are sufficient to support sexual harassment claim).

Contrasting *Reyes* with *Shope* reveals that the focus should be on whether the comments are motivated by gender. The Hedberg court based its conclusion in large part on this question. *See Hedberg* at *2, 1993 U.S.App. LEXIS 33058, at *6. In this case, it does not seem that the custom was necessarily discriminatory. "House bitch" was used to refer to which-

ever officer was without a partner, without regard to the gender of that officer. However, simply because a derogatory term relating to gender is applied to both genders equally does not mean that the use of the term is not derogatory to one gender. However, plaintiffs have failed to introduce any evidence that the term as used in the Department was meant to be derogatory. The Court concludes that the Department custom of designating a "house bitch" was not motivated by gender and could not alone form the basis of Jazikoff's claim. Even without such custom, plaintiffs have alleged conduct that is sufficiently severe to support Jazikoff's claim.

Defendants argue that the Magazine Incident would not be hostile to a reasonable woman. The third prong of *Lehmann* imposes an objective reasonableness standard. *Lehmann* at 611–12, 626 A.2d 445. The *Lehmann* court identified several justifications for adopting an objective standard that inform the Court's inquiry in the present case. First, the LAD is not a tort statute but is "aimed at eradicating discriminatory conduct." *Lehmann* at 612, 626 A.2d 445. Second, an objective standard provides flexibility as community standards evolve. *See Lehmann* at 612, 626 A.2d 445. In this context, the *Lehmann* court noted that this does not mean that the reasonableness standard can be used to hold that a "prevailing level of discrimination is per se reasonable." *Lehmann* at 612, 626 A.2d 445. Finally, the purpose of LAD is "to eliminate real discrimination and harassment." *Lehmann* at 612, 626 A.2d 445. Allegations of an idiosyncratic plaintiff do not state a claim because such claims would not address real discrimination. *Lehmann* at 613, 626 A.2d 445.

■ In evaluating reasonableness, the court should take into account that comments may be just a joke, *See Lehmann,*

132 N.J. at 615, 626 A.2d 445, but should not apply the standard of a reasonable man. *See Woods–Pirozzi,* 290 N.J.Super. at 267, 675 A.2d 684. Although the Magazine Incident may have been intended as a joke, a jury could conclude that a reasonable woman would find it hostile to be analogized to scantily clad women in a men's magazine by several male co-workers in deciding which one they might "pick" as a sexual partner. This is particularly true in light of the other incidents alleged.

In contrast to the incidents alleged with regard to Landis and Blount, the record is thin for Pepenella and the incidents alleged are not particularly severe. Plaintiffs assert that Pepenella made "unwanted romantic overtures" to Jazikoff. Plaintiffs also allege that Pepenella made an isolated reference to oral sex. Plaintiff is not entitled to a workplace free of annoyances. *See Lynch* at 452. Pepenella's mistaken impressions and unwanted overtures, particularly when contrasted with the behavior of other members of the Department, are not severe or pervasive enough to support a claim under the LAD on their own. However, because there is no co-employee liability under the LAD, Pepenella's liability alone is not the issue. While, standing alone, plaintiffs' allegations against Pepenella might not sustain a claim under the LAD, in connection with the allegations against Landis and Blount, they are proper grounds for recovery against the County or Department.

Finally, defendants argue that the actions of Spicuzzo and Falcone do not support an actionable claim because Ivan made no claims of any specific acts as to Spicuzzo or Falcone. The Court notes that, while plaintiffs did not allege any specific acts of harassment by Spicuzzo or Falcone, they did allege acts that may have contributed to a hostile work environ-

ment claim. Falcone commented in response to Jazikoff's complaint that Spicuzzo was very upset with her and added "I've been through this sexual harassment bullshit before with charges against me" and "[y]ou think you females can go against us? You think you might have a case? Try it, go for it. You will never ever win. No jury would ever find me or my department guilty of this female bullshit." (Nulty Cert., Ex. K at ¶ 11.) Spicuzzo as well appears to have failed to respond properly to complaints of harassment. According to Falcone, Spicuzzo decided not to take any action against Allen, despite a recommendation of discipline. (Nulty Cert., Ex. JJ at 349:25–350:9). In any event, it is irrelevant to plaintiffs claims against the County and Department whether they allege specific acts of discrimination by Spicuzzo or Falcone. As concluded, any claims against Spicuzzo or Falcone under Counts One and Two must be dismissed but Spicuzzo or Falcone may still be liable to the extent they aided and abetted violations of the LAD.[5] The present issue, however, is whether the actions of Spicuzzo and/or Falcone can support a hostile work environment claim against the Department and/or County.

Defendants do argue that the first two statements do not establish a hostile work environment because they are not objectionable or threatening and that the third statement fails the "but for" standard. The Court does not agree. While Falcone's statement that Spicuzzo is upset with Jazikoff because of the complaint might be viewed as unobjectionable, a reasonable juror could also conclude that the statement was meant to express disapproval of complaints of sexual harassment at the highest levels of the Department. The severity of Falcone's statement is exacerbated because he was a supervisor and

suggests that upper-level management was displeased with Jazikoff for complaining. *See Taylor,* 152 N.J. at 502–06, 706 A.2d 685. The second and third statements are facially gender-related and, therefore, a presumption that they would not have been made but for Jazikoff's gender applies. *See Reyes,* 997 F.Supp. 614; *Hedberg,* 202 F.3d 273; *Boyce,* 963 F.Supp. 290; *Shope,* 14 F.3d 596. The Court concludes that the actions of Falcone and Spicuzzo could support a hostile work environment claim against the County and/or the Department.

More generally, defendants claim that plaintiffs' allegations would extend the scope of the LAD to become a "general civility code." (Def.'s Reply at 3 (citing *Heitzman* at 147, 728 A.2d 297.)) According to defendants, allegations concerning "harassment and pervasively sexist attitudes" which the plaintiffs did not witness or of which they were not aware should not preclude summary judgment. (Defs.' Reply at 4 (citing *Morales–Evans* at 588–90); *Sprint/United Mgmt. Co. v. Mendelsohn,* —— U.S. ——, 128 S.Ct. 1140, 1145, 170 L.Ed.2d 1 (2008).) Defendants are most troubled by plaintiffs' introduction of statements by officers Alteria and Netta regarding Allen's conduct and references to allegations by sheriff's officer Hamilton made in another lawsuit.

Plaintiffs are not legally entitled to an ideal workplace, "free of annoyances and colleagues [plaintiffs] find[ ] disagreeable." *Lynch* at 452. However, plaintiffs allegations are not limited only to uncivil comments or comments made outside the presence of plaintiffs. Plaintiffs have alleged several specific instances of sexual and gender-based comments made either directly to plaintiffs or in the presence of plaintiffs. Denying summary judgment in

---

**5.** This claim is discussed below.

these circumstances will not extend the scope of the LAD but, rather, properly allow a jury to determine if these comments are severe and pervasive enough to constitute a hostile work environment.

In summary, defendants motion for summary judgment on Counts One and Two with regard to individual defendants Allen, Blount, Falcone, Spicuzzo, Landis and Pepenella is granted. Defendants' motion for summary judgment with regard to Counts One and Two against the County and Department is denied.

### 3. Counts Three & Four: Vicarious Liability

At Counts Three and Four plaintiffs claim the County and/or Department are liable for compensatory and punitive damages. Defendants argue that the Court should grant summary judgment on Counts Three and Four because plaintiffs knowingly and willfully failed to comply with their duty to report incidents of sexual harassment and/or discrimination and, when complaints were filed, the Department acted immediately to investigate. Plaintiffs response is two-fold. First, plaintiffs argue that defendants were negligent in that the Department failed to take effective remedial measures in response to complaints. Second, plaintiffs claim that the County and/or Department are liable because Blount and Allen were aided in their harassment by the Department's grant of power to control the day-to-day working environment of plaintiffs.

#### a. Standard

■■■ Employers are strictly liable for equitable remedies and relief arising from hostile work environment claims. *Lehmann* at 617, 626 A.2d 445. Agency principles apply to the determination of whether an employer is liable for compensatory and/or punitive damages. *Lehmann* at 619, 626 A.2d 445. To hold her employer vicariously liable a plaintiff must prove an objectionable act or action was done by a supervisor acting as such employer's agent. *See id.*

■■■ Under the Restatement (Second) of Agency (1958) § 219(1), the "master is subject to liability for the torts of his servants committed while acting in the scope of their employment." A "master is not subject to liability for the torts of his servants acting outside the scope of their employment *unless:*" (1) the master intended the conduct or consequences; (2) the master was negligent or reckless; (3) the conduct violated a non-delegable duty; or (4) the agent acted with apparent authority, i.e. the "[s]ervant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." *Id.* (quoting *Lehmann* at 619, 626 A.2d 445).[6]

■■■ The upshot of these principles is, where a supervisory employee acts within the scope of employment, the employer is liable for compensatory damages and may be liable for punitive damages. *See Lehmann* at 619–20, 626 A.2d 445. Where allegedly discriminatory acts are taken by supervisors outside the scope of

---

**6.** The *Lehmann* court relied on the Restatement (Second) of Agency (1958), which has been superceded by the Restatement (Third) of Agency (2006) which was recently relied upon by the New Jersey Supreme Court in *NCP Litig. Trust v. KPMG LLP,* 187 N.J. 353, 366, 901 A.2d 871 (2006); *see also Estate of*

Cordero v. Christ Hosp., 403 N.J.Super. 306, 312, 958 A.2d 101 (App.Div.2008). The principles in Restatement (Second) § 219 relied upon by the *Lehmann* court are unchanged in Restatement (Third). *See Restatement (Third) of Agency* (2006) § 7.03–08.

employment or by non-supervisors the employer is not liable for compensatory or punitive damages except in limited circumstances. *See Heitzman v. Monmouth County*, 321 N.J.Super. 133, 146, 728 A.2d 297 (App.Div.1999). As example, in *Woods–Pirozzi*, the employer was not liable where a supervisor acted contrary to an anti-discrimination policy and discriminatory comments were "not made as part of exercise duty." *Woods–Pirozzi* at 271, 675 A.2d 684.

■■■ Even where a supervisor acted outside the scope of employment, the employer may yet be liable under the exceptions found in Section 219(2). *See Lehmann* at 620, 626 A.2d 445; Restatement (Second) of Agency § 219(2). First, an employer can be vicariously liable if, although the employer was not negligent, a position of authority enabled the supervisor to harass plaintiff. *See Woods–Pirozzi* at 271–72, 675 A.2d 684; Restatement (Second) of Agency § 219(2)(d). A court should ask the following questions in determining if an employer is liable in this context: (1) did the employer delegate the authority to the supervisor to control the situation of which the plaintiff complains; (2) did the supervisor exercise that authority; (3) did the exercise of authority result in a violation of [the LAD]; and (4) did the authority delegated by the employer to the supervisor aid the supervisor in injuring the plaintiff? *See Lehmann* at 620, 626 A.2d 445 (citing Bruce Chandler Smith, *When Should an Employer Be Held Liable For the Sexual Harassment by a Supervisor Who Creates a Hostile Work Environment? A Proposed Theory of Liability*, 19 *Ariz.St.L.J.* 285, 321 (1987)).

■■■ Second, an employer can be vicariously liable if such employer was negligent in preventing harassment by its employee. *See* Restatement (Second) of Agency § 219(2)(b). Sexual harassment can be foreseeable even where anti-harassment policies exist. *See Lehmann* at 621, 626 A.2d 445. A plaintiff could demonstrate negligence via "failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms." *Id.* On the other hand, existence of "effective preventative mechanisms" is some evidence of due care. *Id.* at 622, 626 A.2d 445. "Effective" remedial measures are those reasonably calculated to end the harassment, *See id.* at 623, 626 A.2d 445, and include "policies, complaint structures, and that includes both formal and informal structures; training, which has to be mandatory for supervisors and managers and needs to be offered for all members of the organization; some effective sensing or monitoring mechanisms, to find out if the policies and complaint structures are trusted; and then, finally, an unequivocal commitment from the top that is not just in words but backed up by consistent practice." *Lehmann* at 621–22, 626 A.2d 445 (citing *Klein* at 171). The presence or absence of complaints is relevant to determination of negligence. *Woods–Pirozzi* at 272, 675 A.2d 684.

■■■ Third, an employer can be vicariously liable when a plaintiff shows an employer "had actual knowledge of the harassment and did not promptly and effectively act to stop it." *Lehmann* at 622, 626 A.2d 445. It is much more likely that a plaintiff would succeed under a negligence or recklessness theory by showing constructive knowledge. *See e.g. EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1516 (9th Cir.1989) (employer had constructive knowledge of harassment); *Yates v. Avco Corp.*, 819 F.2d 630, 636 (6th Cir.1987) (harassment was foreseeable); *Robinson v. Jacksonville Shipyards*, 760 F.Supp.

1486, 1531 (M.D.Fla.1991) (employer had constructive knowledge of harassment).

■ Vicarious liability can also be understood as direct liability. "When an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile." *Lehmann* at 623, 626 A.2d 445. The "employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser." *Id.* at 623, 626 A.2d 445.

■ "[A] higher level of culpability than mere negligence should be required for punitive damages." *Id.* at 626, 626 A.2d 445. Employers "should be liable for punitive damages only in the event of actual participation by upper management or willful indifference." *Id.* at 624, 626 A.2d 445. Where plaintiff does not allege any discrimination above her immediate supervisor there is no ground for punitive damages. *Woods–Pirozzi* at 273, 675 A.2d 684

*b. Analysis*

■ Plaintiffs do not seriously argue that any of the alleged acts of harassment occurred within the scope of employment. As a general rule, "a supervisor who sexually harasses a subordinate is not acting within the scope of his employment." *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 758, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The Court concludes that the general rule applies in this case and that the County or Department can only be liable for compensatory or punitive damages if one of the four exceptions in the Restatement applies. The first and third do not. The first exception would require a showing that the County or Department intended the discrimination and nothing in the record supports such a conclusion. The

third exception does not apply because there is no non-delegable duty at issue. So the County or Department can only be liable for compensatory or punitive damages if they were negligent or reckless, or if the position of authority conferred upon Falcone, Spicuzzo, Blount or Allen by the Department enabled the harassment of plaintiffs.

■ Plaintiffs have submitted sufficient evidence to create a genuine issue of material fact as to whether defendants were negligent or reckless in relation to plaintiffs claims. The promulgation of the policy does not necessarily insulate the County or Department from a finding of negligence. *See Hargrave,* 262 F.Supp.2d at 431; *see also Lehmann* at 621, 626 A.2d 445. Although defendants argue that *Cavuoti* creates a "safe haven" for employers who promulgate an anti-harassment policy that case involved only punitive damages. *See Cavuoti v. New Jersey Transit Corp.,* 161 N.J. 107, 120–21, 735 A.2d 548 (1999). Plaintiffs here seek both compensatory and punitive damages. In any event, *Cavuoti* did not hold, even solely in the area of punitive damages, that simple promulgation of a policy is sufficient to insulate an employer from vicarious liability. *Cavuoti* held only that "the efficacy of an employer's remedial program is highly relevant to both the employee's claim against the employer and the employer's defense to liability." *Id.* at 121, 735 A.2d 548 (quoting *Payton v. New Jersey Turnpike Authority,* 148 N.J. 524, 536–37, 691 A.2d 321 (1997)). "[E]ffective preventative mechanisms" would be some evidence of due care, *Lehmann* at 622, 626 A.2d 445, but plaintiff has asserted facts that call into question the effectiveness and consistency of the Department's enforcement of the policy. If its enforcement was ineffective, the Department could be found negli-

gent or reckless. *See Lehmann* at 621–22, 626 A.2d 445 (citing *Klein* at 171).

Although plaintiffs did testify that they were aware that they had a duty to report violations under the policy and failed to do so on several occasions, the record also demonstrates that plaintiffs did in fact complain, both formally and informally, about several instances of discrimination and were discouraged from pursuing these claims. (*See e.g.,* Pls.' Opp. 64, Ex C, Ivan 174:17–178:15; Pls.' Opp. 64, Ex C, Ivan 233:11–233:22; Statement of Facts at 5–6 (with regard to plaintiff Ivan); Statement of Facts at 10 (with regard to plaintiff Jazikoff).) Any failure by Ivan or Jazikoff to formally report harassment carries less weight because plaintiffs have introduced evidence tending to show that defendants failed to establish meaningful and effective enforcement mechanisms. *See Gaines v. Bellino,* 173 N.J. 301, 318, 801 A.2d 322 (2002). When plaintiffs did complain, the record suggests that the investigations were inadequate. The investigation of Allen's conduct was not conducted within the prescribed time frame and, despite finding a violation, no punishment was ever imposed. Investigations of Blount and Pepenella were marred by failures to interview witnesses and purported falsification by Alai of statements made by McDermid. The lack of effectiveness of this remedial scheme is relevant to determining if employer was negligent, *See Payton,* 148 N.J. at 537, 691 A.2d 321, and plaintiffs have submitted sufficient facts for a reasonable jury to conclude that defendants were negligent in enforcing the policy.

The County or Department could also be liable if Falcone, Spicuzzo, Blount or Allen were aided in violating the LAD "by the power delegated to [them] or to control the day-to-day working environment." *Lehmann* at 620, 626 A.2d 445; *see also Cavuoti.* Allen had limited authority over Ivan but the record suggests that the authority that Allen did have aided violations of the LAD on two occasions: the courthouse bathroom incident and the military birthday party incident. Similarly, Blount exercised his authority to order Jazikoff to turn around at roll call and in the gun cleaning incident. A reasonable juror could conclude based on these events that the County or Department should be liable for compensatory damages.

 Punitive damages presents a closer question. The County or Department can only be liable for punitive damages if plaintiff submits evidence of "actual participation … or willful indifference." *See Lehmann* at 626, 626 A.2d 445. In order for the Department or County to be liable for punitive damages, plaintiffs must allege discrimination committed above their immediate supervisors. "[A] higher level of culpability than mere negligence should be required for punitive damages." *Lehmann* at 626, 626 A.2d 445. Employers "should be liable for punitive damages only in the event of actual participation by upper management or willful indifference." *Lehmann* at 624, 626 A.2d 445. Allen was not Ivan's direct supervisor although he did have authority over her at times. Jazikoff alleges that she was harassed by Blount at the time that Blount was her direct supervisor but Jazikoff, similarly, fails to allege any acts of harassment committed at higher levels of the Department or County.

Plaintiffs, however, did submit evidence that Spicuzzo refused to impose punishment recommended for Allen despite a recommendation that it be imposed. While this evidence is relatively thin, plaintiffs have created a genuine issue of material fact as to whether Spicuzzo and other upper management were willfully indifferent to plaintiffs' complaints. Accordingly, the Court denies defendants' motions for

summary judgment on Counts Three and Four.

### 4. Counts Five & Six: Aiding and Abetting

As noted, supervisors Spicuzzo, Falcone, Blount and Allen could be individually liable for aiding and abetting violations of the LAD. Defendants argue that none of the defendant supervisors can be liable for aiding and abetting because none intended any of the alleged harassment. Plaintiffs respond that the Blount and Allen can be liable for aiding and abetting acts of harassment that they committed themselves and Spicuzzo and Falcone can be liable for ignoring acts of harassment committed by others.

#### a. Standard

 The LAD imposes individual liability for "any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." *N.J.S.A.* 10:5–12(e). The New Jersey Supreme Court has confirmed the Third Circuit's prediction that the standard for "aid" and "abet" under the LAD is based on the Restatement (Second) of Torts. *See Tarr v. Ciasulli*, 181 N.J. 70, 84, 853 A.2d 921 (2004) (citing *Hurley*, 174 F.3d at 127); *see* Restatement (Second) of Torts § 876(b). For an employee to be liable as an aider and abettor under the LAD, "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly

and substantially assist the principal violation." *Tarr* at 84, 853 A.2d 921 (quoting *Hurley* at 127).

 Whether a defendant has provided "substantial assistance" depends on five factors detailed in the Restatements' comments: (1) the nature of the act encouraged; (2) the amount of assistance given by the supervisor; (3) whether the supervisor was present at the time of the asserted harassment; (4) the supervisor's relations to the others; and (5) the state of mind of the supervisor. *See* Restatement (Second) Torts § 876(b), comment d.

 The LAD does not impose individual liability upon non-supervisory employees, *Tyson* 918 F.Supp. at 841, but a supervisor may be liable for aiding and abetting his or her own conduct.[7] *Hurley*, 174 F.3d at 126. To reconcile these two positions, the Third Circuit concluded:

> "Employees are not liable as aider and abettor merely because they had some role, or knowledge or involvement. Rather, the degree of involvement, knowledge and culpability required as a basis for liability is heightened by the standard that the Restatement sets forth and we adopt. Only those employees who meet this heightened standard will be aiders and abettors. It is important that this standard be set above mere knowledge and/or implementation, lest a reverse respondeat superior liability could be created under the guise of aiding and abetting."

*Failla v. City of Passaic*, 146 F.3d 149, 159 (3rd Cir.1998).

---

7. *Hurley* explained this "somewhat awkward" theory of liability on the basis of the supervisor's duty to act against harassment. *Hurley*, 174 F.3d at 126 (citing *Taylor*, 706 A.2d at 691). Such duty can be violated by deliberate indifference or affirmatively harassing acts. "When a supervisor flouts this duty he subjects himself and his employer to liability." *Id.* at 126 (citing *Judson v. Peoples Bank & Trust Co.*, 25 N.J. 17, 134 A.2d 761 (1957)).

■ It is also helpful to keep in mind that for a defendant to be individually liable for aiding and abetting, the employer must also be liable under the LAD. It is not the act of discrimination but rather the failure in the employer's response that an aider and abettor is charged with assisting.

### b. Analysis

■ Because it is uncontested that officers Pepenella and Landis were not supervisors the Court grants summary judgment on Counts Five and Six with regard to them. *See Tyson,* 918 F.Supp. at 841. Only defendants Spicuzzo, Falcone, Blount and Allen can be liable for aiding and abetting.

These defendants argue that they are entitled to summary judgment because plaintiffs have failed to allege any affirmative acts by Spicuzzo and Falcone, and that any affirmative acts committed by Blount or Allen were committed outside the scope of employment and that neither Blount nor Allen willfully and knowingly associated himself with any other unlawful acts. Defendants argue further that the record does not contain evidence suggesting that any of the individual defendants were aware of their role in the purported tortious conduct or knowingly and substantially assisted a principal violation.[8]

### i. Spicuzzo & Falcone

■ Defendants' assertion that there is no evidence that Spicuzzo and Falcone engaged in any affirmative acts of discrimination is not dispositive because inaction that "rises to the level of providing substantial assistance or encouragement" could be the basis of aiding and abetting liability. *Hurley,* 174 F.3d at 128 (quoting

*Failla,* 146 F.3d at 158, n. 11); *see also Tarr* at 84, 853 A.2d 921.

■ Plaintiffs claim that Spicuzzo acquiesced to acts of sexual harassment and the creation of a hostile work environment. Plaintiffs claim that Spicuzzo routinely failed to impose appropriate discipline. Specifically, Falcone was not punished despite a jury finding, in an unrelated case involving another sheriff's officer, that Falcone had created a hostile work environment; Allen was not disciplined after discipline was recommended by Director Cross; and Spicuzzo tolerated pornographic materials in the workplace. Plaintiffs argue further that Spicuzzo bears responsibility for the Department's discriminatory policies and procedures. Finally, plaintiffs argue that Spicuzzo's personal animus for Ivan, as determined by the administrative law judge, establishes how Spicuzzo "poisoned [Ivan's] working environment."

The lack of discipline against Falcone in officer Mazzei's case is irrelevant. Such failure, even if true, would not tend to show that Spicuzzo responded inadequately to complaints from plaintiffs Ivan or Jazikoff. It is not enough to simply assert that Spicuzzo is the highest ranking official in the Department. The Court is mindful of the Third Circuit's admonishment that "[i]t is important that this standard be set above mere knowledge and/or implementation, lest a reverse respondeat superior liability could be created under the guise of aiding and abetting." While Spicuzzo clearly had a hand in creating the departmental policies, the law·requires more to hold Spicuzzo individually liable. Even without consideration of these facts, plaintiffs have submitted sufficient evidence to

---

8. Defendants also assert that none of the individual defendants "shared a community of discriminatory purpose with an alleged actual perpetrator or that they knew of an alleged principal's discriminatory conduct." (Defs.' Supp. 33 (quoting *Herman v. Coastal Corp.,* 348 N.J.Super. 1, 27, 791 A.2d 238 (App.Div. 2002).))

survive summary judgment. More importantly, Spicuzzo, despite receiving clear notice of a violation of the LAD declined to impose punishment on Allen. Additionally, pornography was often present in the department. While there is no direct evidence that Spicuzzo knew of the pornography, a jury could reasonably infer that he must have known of its existence.

The allegations with regard to Falcone are also sufficient to survive summary judgment. A juror could reasonably infer from Falcone's comments that Spicuzzo did not plan to impose punishment on Ivan that he was "generally aware of his role" as part of the harassment of plaintiffs. Additionally, a reasonable juror could conclude that Falcone knowingly and substantially assisted the violation of the LAD by discouraging complaints. *See Tarr* at 84, 853 A.2d 921. Falcone directed the threats both generally at roll call and specifically toward both plaintiffs in response to their complaints of harassment. Falcone told Jazikoff, "I've been through this sexual harassment bullshit before with charges against me" and "[y]ou think you females can go against us? You think you might have a case? Try it, go for it. You will never ever win. No jury would ever find me or my department guilty of this female bullshit." (Nulty Cert., Ex. K at ¶ 11.) In answer to complaints from Ivan, Falcone threatened that he would "drum up" charges against her. (Statement of Facts at 46.) Plaintiffs also claim that they were discouraged from filing complaints for fear of reprisals.

### ii. Blount & Allen

 Plaintiffs rest their aiding and abetting claims against Blount and Allen primarily on the affirmative acts of harassment alleged against each defendant. Defendants argue that any affirmative acts committed by Blount or Allen were committed outside the scope of employment and that neither willfully and knowingly associated himself with any other unlawful acts. Having held that the actions of both Blount and Allen could be the basis of liability for the County or Department, the Court need not address here whether their acts were within the scope of employment. Blount or Allen as supervisors can be held liable for aiding and abetting their own specific acts of harassment. *See Hurley*, 174 F.3d at 126. Defendants' motion for summary judgment on Counts Five and Six is denied.

### Counts Eleven through Fifteen: Retaliation under CEPA, LAD and the Petition Clause

At Counts Eleven through Fifteen, plaintiffs claim that defendants retaliated against Jazikoff and Ivan in response to both their formal and informal complaints. Plaintiffs ground these claims on the LAD, the petition clause of the First Amendment to the United States Constitution and, with regard only to plaintiff Ivan, the New Jersey Conscientious Employee Protection Act ("CEPA"). Before turning to the merits of these retaliation claims, the Court must resolve several procedural issues relating to Ivan's claims. First, defendants argue that by instituting a CEPA claim, Ivan has waived her other retaliation claims. Second, defendants argue that Ivan's CEPA claim is barred by the statute of limitations.

### 5. Waiver of claims under CEPA

#### a. Standard

 Filing of a claim under CEPA acts as a waiver of other retaliation claims. The relevant statutory text reads:

"Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or

under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J. Stat. Ann. § 34:19–8 (2008).

■ As the New Jersey Supreme Court has observed, the scope of the waiver provision is unclear from this text alone. *See Young v. Schering Corp.,* 141 N.J. 16, 24–25, 660 A.2d 1153 (1995). In any event, CEPA was enacted to protect whistleblowers from retaliatory action, *see id.* at 23, 660 A.2d 1153, and the scope is accordingly limited to claims for retaliatory discharge. *See Flaherty v. Enclave,* 255 N.J.Super. 407, 413–14, 605 A.2d 301 (Law Div.1992) (claims for pre-termination compensation not waived by filing of CEPA claim). "The causes of action that fall within this waiver provision are those causes of action that are directly related to the employee's termination due to disclosure of the employer's wrongdoing." *Falco v. Community Medical Center,* 296 N.J.Super. 298, 318, 686 A.2d 1212 (App. Div.1997) *overruled on other grounds* by *Dzwonar v. McDevitt,* 177 N.J. 451, 463, 828 A.2d 893 (2003) (quoting *Young v. Schering Corp.,* 275 N.J.Super. 221, 238, 645 A.2d 1238 (App.Div.1994)), *aff'd* 141 N.J. 16, 660 A.2d 1153 (1995) (dismissing claims for retaliatory discharge, constitutional tort, negligent infliction of emotional stress, intentional infliction of emotional stress, and discharge in violation of public policy as waived by plaintiff's assertion of a CEPA claim).

■ On the other hand, causes of action that are "substantially independent" from the CEPA claims are not waived by institution of a CEPA action. *See Young,* 141 N.J. at 29, 33, 660 A.2d 1153. The

question is whether the other claims require different proofs from those required to sustain a CEPA claim. *See id.* at 30–31, 660 A.2d 1153. If a claim once proven would not be a violation of CEPA, such claim would not be waived by assertion of a CEPA claim. *See Casper v. Paine Webber Group, Inc.,* 787 F.Supp. 1480, 1509 (D.N.J.1992).

Several courts in this district have applied this standard to conclude that certain claims were waived, as have several New Jersey courts. *See, e.g., Lynch v. New Deal Delivery Service, Inc.,* 974 F.Supp. 441, 456 (D.N.J.1997) (by instituting CEPA claim, plaintiff waived retaliatory discharge based on intentional infliction of emotional stress claims); *Cokus v. Bristol Myers Squibb Co.,* 362 N.J.Super. 366, 390–91, 827 A.2d 1173 (Law Div.2002) *aff'd,* 362 N.J.Super. 245, 827 A.2d 1098 (App. Div.2003) (claims waived because facts underlying both CEPA claim and emotional distress claim were the same); *Falco,* 296 N.J.Super. at 325–26, 686 A.2d 1212 (court properly denied motion to amend complaint based on CEPA's waiver provisions). Courts have also found that claims based on factual scenarios that might support a CEPA claim are not waived if they require different proofs. *See, e.g., Kadetsky v. Egg Harbor Township Board of Education,* 82 F.Supp.2d 327, 342 (D.N.J.2000) (citing *Young,* 141 N.J. at 32, 660 A.2d 1153) (defamation claim not waived because defamation, although it might involve factual scenarios that might form the basis of a retaliation claim, requires different proofs from CEPA claim) (internal citations omitted).

■ Not every LAD claim is waived by assertion of a CEPA claim, just those that would require a finding that would be actionable under CEPA. *Cf. Bowen v. Parking Authority of the City of Camden,* No. 00–5765(JBS), 2003 WL

22145814, \*24 (D.N.J. Sept. 13, 2003) at 24 (citing *Young*, 141 N.J. at 29, 660 A.2d 1153). But retaliation claims under the LAD necessarily fall within the CEPA waiver provision. *Bowen* (citing *Sandom v. Travelers Mtg. Servs., Inc.*, 752 F.Supp. 1240, 1244 (D.N.J.1990)).

#### b. Analysis

The Court notes as an initial matter that Ivan failed to address defendants' waiver argument in their briefing. In any event, applying the standard, defendants are entitled to summary judgment on Ivan's retaliation claims in Counts Seven and Eleven unless they are "substantially independent" from her CEPA claims. *Young*, 141 N.J. at 33, 660 A.2d 1153. These claims can avoid waiver if they require different proofs from those required to sustain a CEPA claim. *See Young*, 141 N.J. at 30–31, 660 A.2d 1153.

With respect to their LAD retaliation claim, Ivan cannot make this showing. In Count Seven, Ivan alleges that she suffered retaliation by complaining about incidents of sexual harassment in violation of the LAD. (Compl. ¶¶ 190–96.) "It is beyond dispute that the framework for proving a CEPA claim follows that of a LAD claim." *Donofry v. Autotote Systems, Inc.*, 350 N.J.Super. 276, 290, 795 A.2d 260 (App.Div.2001) (citing *Abbamont v. Piscataway Township Bd. of Educ.*, 138 N.J. 405, 418, 650 A.2d 958 (1994); *Kolb v. Burns*, 320 N.J.Super. 467, 477, 727 A.2d 525 (App.Div.1999)). CEPA requires proof of four elements: (1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action. *See Kolb*, 320

N.J.Super. at 476, 727 A.2d 525; *see also Dzwonar*, 177 N.J. at 462, 828 A.2d 893. The latter three of these are the elements a plaintiff must prove to prevail on the LAD retaliation claim. *Bowen*, 2003 WL 22145814, \*24.

Similarly, Ivan's petition clause claims, if proved, would form the basis of a CEPA claim. *See, e.g., Falco*, 296 N.J.Super. at 304, 318, 686 A.2d 1212 (affirming trial court determination that claim for constitutional tort was waived by electing CEPA claim). There is no clear case law, however, as to whether CEPA waiver provisions reach federal retaliation claims as well. Because defendants concede that the CEPA waiver provision does not apply to plaintiffs' federal claims, (Defs.' Supp. (Dkt. Entry No. 138) 7 n. 1.), the Court declines to reach this question and assumes that Ivan's petition clause claims can proceed.

Defendants' motion for summary judgment is granted with respect to Count Seven and denied as to Count Eleven.

#### 6. CEPA Statute of Limitations

Defendants argue that Ivan's CEPA claim is barred by the statute of limitations because the only act attributable to Spicuzzo occurred on December 16, 2002 and Ivan did not add her CEPA claim to the present matter until January 8, 2004. (Defs.' Opp. 5–6.) Plaintiffs argue that Ivan's CEPA claim is timely because the statute of limitations starts not from the date Spicuzzo witnessed the alleged smoking, or even when Spicuzzo issued the Preliminary Notice of Disciplinary Action but from the date of Ivan's suspension on May 12, 2003.

#### a. Standard

The statute of limitations for CEPA claims is one year. *See* N.J. Stat. Ann. § 34:19–5 (2000); *see also Green v.*

*Jersey City Bd. of Educ.,* 177 N.J. 434, 446, 828 A.2d 883 (2003). The CEPA claim accrues on the date of the adverse employment action. *See Jones v. Jersey City Med. Ctr.,* 20 F.Supp.2d 770, 772 (D.N.J.1998). CEPA prohibits retaliatory action in response to whistle-blowing. *See* N.J. Stat. Ann. § 34:19–3 (2000). "The definition of retaliatory action speaks in terms of completed action. Discharge, suspension or demotion are final acts. 'Retaliatory action' does not encompass action taken to effectuate the 'discharge, suspension or demotion.'" *Daniels v. Mut. Life Ins. Co.,* 340 N.J.Super. 11, 16, 773 A.2d 718 (App.Div.2001) (quoting *Keelan v. Bell Communications Research,* 289 N.J.Super. 531, 539, 674 A.2d 603 (App. Div.1996)).

#### b. Analysis

 Ivan's cause of action accrued on the date of the "adverse employment action." With regard to the Smoking Incident, this occurred on May 12, 2003 when she was suspended. So, her claim, having been filed on January 8, 2004, was timely. Here, as in *Keelan,* "[c]ommencing the statute of limitations at an earlier date [would] contravene[ ] the concept that CEPA is remedial legislation that should be liberally construed." *Keelan,* 289 N.J.Super. at 540, 674 A.2d 603. Ivan's CEPA claim is not time-barred.

#### 7. LAD retaliation, CEPA and the petition clause

In summary, by asserting her CEPA claim Ivan waived her LAD retaliation claims but did not waive her petition clause claim. In addition, Ivan's CEPA claim is not time barred. The Court now considers the parties' respective motions for summary judgment on plaintiffs' remaining retaliation claims: Ivan's CEPA claim, Jazikoff's LAD retaliation claim and the petition clause claims of both plaintiffs. Because the LAD, CEPA and the petition clause share similar retaliation standards and often case law, it is helpful to discuss the standards together.

#### a. CEPA

 CEPA was enacted "to protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employees from engaging" in such activity. *Abbamont,* 138 N.J. 405, 431, 650 A.2d 958 (1994); *see also Barratt v. Cushman & Wakefield,* 144 N.J. 120, 127, 675 A.2d 1094 (1996); *Higgins v. Pascack Valley Hospital,* 158 N.J. 404, 417, 730 A.2d 327 (1999). CEPA should be construed liberally to achieve this purpose. *See Estate of Roach v. TRW, Inc.,* 164 N.J. 598, 610, 754 A.2d 544 (2000).

Under CEPA, "[a]n employer shall not take any retaliatory action against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ... (2) is fraudulent or criminal[;] ...

b. Provides information to, or testifies before, any public body conducting an investigation hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer[;] ... or

c. Objects to or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law [;] ...

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment."

*N.J. Stat. Ann.* § 34:19–3.

To succeed in a CEPA claim a plaintiff must prove four elements: (1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action. *See Kolb*, 320 N.J.Super. at 476, 727 A.2d 525; *Dzwonar*, 177 N.J. at 462, 828 A.2d 893.

 At base, CEPA covers employee complaints about activities the employee reasonably believes are (i) in violation of specific statute or regulation; (ii) fraudulent or criminal; or (iii) incompatible with policies concerning public health, safety or welfare or the protection of the environment. *See Estate of Roach*, 164 N.J. at 610, 754 A.2d 544.

### b. LAD Retaliation

The LAD prohibits

"reprisals against any person because that person has opposed any practices or acts forbidden under [the LAD] or because that person has filed a complaint, testified or assisted in any proceeding under [the LAD] or to coerce, intimidate, threaten or interfere with any person in the exercise of enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the LAD]."

N.J. Stat. Ann. § 10:5–12(d).

 A successful plaintiff must show: (1) the employee engaged in a pro-tected activity known to the defendant; (2) the employee was thereafter subjected to an adverse employment decision; and (3) there was a causal link between the two. *See Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J.Super. 543, 548, 665 A.2d 1139 (1995) (internal citations omitted). Once a plaintiff establishes these prima facie elements, a defendant must articulate a legitimate non-discriminatory reason for the decision. *See id.* The plaintiff must then come forward with evidence that this reason was merely a pretext for the underlying discriminatory motive. *See id.*

### c. Petition Clause

 The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech, or of the press, or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. Where retaliation is in response to expressive conduct that is speech, a governmental employee has no first amendment immunity from retaliation unless that matter is of public concern. *See San Filippo, Jr. v. Bongiovanni*, 30 F.3d 424, 434 (3d Cir.1994) (citing *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Where the expressive conduct includes filing of a lawsuit or grievance, the petition clause is implicated and such lawsuit need not relate to a matter of public concern. *See id.* at 442–43. As long as a lawsuit is not a sham, it is not a constitutionally permissible grounds for dismissal. *See id.* at 443.

 For a prima facie case under the petition clause, a plaintiff must show: "(1) that [plaintiff] engaged in a protected activity under [the] First Amendment[;] (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firm-

ness from exercising his or her rights[;] and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir.2007). Plaintiff bears the initial burden to demonstrate that the constitutionally protected conduct was "a substantial or motivating factor" in the retaliatory conduct. *See Rauser v. Ward,* 241 F.3d 330, 333 (2001). The defendant then bears the burden of proving by a preponderance of the evidence it would have taken the same action absent the protected activity. *See id.*

### 8. *Analysis*

#### a. *Retaliation*

■■■■ Defendants do not seriously contend that plaintiffs have failed to satisfy the first prong for purposes of each of the three retaliation laws. Whistle-blowing includes disclosure of improper acts or omissions ". . . to a supervisor or a public body . . ." N.J. Stat. Ann. § 34:19–3(a) et seq. As to Jazikoff's LAD claim, filing a charge with the EEOC is clearly protected activity under the LAD. *See Woods–Pirozzi v. Nabisco Foods,* 290 N.J.Super. 252, 275, 675 A.2d 684 (1996). While filing a facially invalid complaint would not constitute "participation," and therefore would not be protected activity under the LAD, plaintiff need only allege a violation of the LAD in his or her complaint in order for the complaint to constitute protected activity. *Cf. Slagle v. County of Clarion,* 435 F.3d 262, 268 (3d Cir.2006) (upholding grant of summary judgment on Title VII retaliation claim where plaintiff made an EEOC charge only for "unspecified civil rights violations").[9] This is true regardless of whether the charges were valid or

reasonable. *See id.* Here, because Jazikoff alleged violations of the LAD in her internal complaints, in her EEOC charge and the complaint in this action, Jazikoff has satisfied this prong for purposes of her LAD retaliation claim.

■■ Likewise, there is no question that Ivan has satisfied the first prong for purposes of her CEPA claim. Ivan's protected activities include writing reports to the Office of Affirmative Action on April 25, 2001 and May 3, 2001, making the EEOC charge and instituting this action. These activities are clearly protected "whistleblowing" activities under CEPA. Under CEPA, Ivan need not show there was an actual violation of law, just that the plaintiff held a reasonable belief that one of the three categories of activities was occurring. *See Estate of Roach,* 164 N.J. at 613, 754 A.2d 544. While the record lacks direct evidence that Ivan reasonably believed that the behavior she complained of violated a law or regulation, the Court has little trouble determining that a reasonable juror could decide from the circumstances that Ivan had such a reasonable belief.

The same is true for both plaintiff's petition clause claims. To succeed under the petition clause a plaintiff must prove that the conduct which led to the alleged retaliation was constitutionally protected. *Rauser,* 241 F.3d at 333 (citing *Thaddeus–X v. Blatter,* 175 F.3d 378, 389 (6th Cir.1999) (en banc); *Drexel v. Vaughn,* No. 96–3918, 1998 WL 151798, *7 (E.D.Pa. April 2, 1998)). Defendants do not dispute that plaintiffs' EEOC charges and federal complaints are constitutionally protected petitions. In any event, these complaints are protected activity so long as they are not shams. *See San Filippo,* 30 F.3d at 443.

---

**9.** Slagle involved a retaliation claim under Title VII. Analysis of Title VII is equally applicable to the LAD. *Cortes v. Univ. of Med. &*

*Dentistry of N.J.,* 391 F.Supp.2d 298, 311 (D.N.J.2005) (citing *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, 1212 (3d Cir.1995)).

Because there is no evidence that any of the complaints are shams, both plaintiffs have satisfied this prong for their petition clause claims.

Each plaintiff must still meet the two latter prongs of each cause of action by introducing evidence of both retaliatory conduct and causation. Because the facts underpinning each plaintiff's claims differ, as do the legal standards for the latter two prongs among these three causes of action, the Court will now discuss the claims of each plaintiff in turn.

### b. Jazikoff

#### i. LAD

■ The standard for retaliatory conduct under the LAD is not entirely clear. Jazikoff urges the Court to apply *Burlington Northern & Santa Fe R.R. Co.*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) and require only a showing that adverse actions would dissuade a reasonable employee from making a complaint. *See* 548 U.S. at 67–68, 126 S.Ct. 2405. *Burlington Northern* involved retaliation under Title VII and the Court is mindful that analysis of Title VII is often applicable to the LAD. *See* n. 8 *supra.* The Court concludes, however, that the *Burlington Northern* standard does not apply to the LAD retaliation provisions. Under the LAD a plaintiff must do more than show that adverse actions would dissuade a reasonable employee from making a complaint: a plaintiff must allege she has suffered an "adverse employment action."

The Court reaches this conclusion because the language of Title VII differs from the LAD as interpreted by New Jersey courts. Title VII prohibits "discriminating" against any employee who opposes unlawful employment practices. *See* 42 U.S.C. § 2000e–3(a). In *Burlington Northern,* the Supreme Court held that this language only required plaintiffs to show that the purported retaliatory action would dissuade a reasonable employee from making a complaint. The LAD makes it illegal to take "reprisals" against any person who opposes or who files complaints against employment practices in violation of the LAD. N.J. Stat. Ann. § 10:5–12(d). In contrast to the *Burlington Northern* standard, New Jersey courts have read the LAD to require plaintiffs alleging retaliation to show an "adverse employment action." *See El–Sioufi v. St. Peter's Univ. Hosp.,* 382 N.J.Super. 145, 176, 887 A.2d 1170 (App. Div.2005). Under the LAD, an "adverse employment action" is one "sufficiently severe or pervasive to have altered plaintiff's conditions of employment in an important and material manner." *Id.* (citing *Cokus* at 246, 827 A.2d 1098) (discussing analogous standard for retaliatory action under CEPA). The Court is further convinced that Burlington Northern does not disturb the requirement that LAD plaintiffs prove that they suffered an "adverse employment action" because the New Jersey Appellate Division noted that Burlington Northern adopted a "reasonable employee" standard for purposes of Title VII retaliation while at the same time holding that LAD retaliation must "affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an employee." *See Schott v. State of New Jersey,* 2006 WL 1911375, *9 n. 3 (N.J.Super.App.Div. July 13, 2006) (internal citations omitted). It may be arguable that the LAD shares the statutory characteristics that led the Supreme Court to conclude that a lower bar applied to Title VII retaliation plaintiffs. New Jersey courts, however, have held that the LAD requires an "adverse employment

action" and the Court will apply this standard to plaintiffs' LAD retaliation claims.

 Turning to the merits, courts have looked to CEPA for guidance on what constitutes an "adverse employment action." *See El–Sioufi*, 382 N.J.Super. at 176, 887 A.2d 1170. Under CEPA, "[t]he definition of retaliatory action speaks in terms of completed action. Discharge, suspension or demotion are final acts." *Daniels*, 340 N.J.Super. at 16, 773 A.2d 718 (quoting *Keelan*, 289 N.J.Super. at 539, 674 A.2d 603). When a plaintiff does not allege a discharge, suspension or demotion, "conduct must be serious and tangible enough to materially alter the employee's terms and conditions of employment or adversely affect her status as an employee." *Cortes v. Univ. of Med. & Dentistry of N.J.*, 391 F.Supp.2d 298, 312 (D.N.J.2005) (citing *Calloway v. E.I. DuPont de Nemours & Co.*, No. 98–669, 2000 WL 1251909, *8, 2000 U.S. Dist. LEXIS 12642 (D.Del. Aug. 8, 2000)).

 Generally, harassment alone is not enough. *Cortes*, 391 F.Supp.2d at 312 (citing *Shepherd v. Hunterdon Develop. Ctr.*, 336 N.J.Super. 395, 419, 765 A.2d 217 (App.Div.2001) *rev'd in part*, 174 N.J. 1, 803 A.2d 611 (2002)). The *Cortes* court concluded that a plaintiff EMT who alleged various acts of harassment by co-workers, including tampering with her work equipment and expressing desires not to work with her had failed to show an adverse employment action because none of the acts was serious and tangible and none was capable of inflicting direct economic harm. *Cortes*, 391 F.Supp.2d at 313. Harassment can make a claim of retaliation more credible but an adverse employment action requires something more. *See Shepherd*, 336 N.J.Super. at 419, 765 A.2d 217 (citing *Hurley v. Atlantic City Police Dep't*, 933 F.Supp. 396 (D.N.J.1996), *aff'd* 174 F.3d 95 (3d Cir.

1999) (claim could proceed because plaintiff was transferred to an undesirable post and was denied a pay raise)). Harassment could form the basis of retaliation claim if it was egregious enough to constitute a constructive adverse employment action. As example, if harassment was so intolerable that plaintiff was forced to transfer. *See Shepherd*, 336 N.J.Super. at 419, 765 A.2d 217.

Plaintiff need not show that the adverse employment action resulted in financial hardship. Although defendants argue that a transfer cannot be an adverse employment action unless it results in a tangible loss, *See Schott v. State of New Jersey*, 2006 WL 1911375 (N.J.Super.App.Div. July 13, 2006), that opinion does not clearly support the proposition that any transfer that does not result in a tangible loss cannot constitute an adverse employment action. Rather, the *Schott* court focused on whether, under an objective standard, a transfer was materially adverse. *Schott*, 2006 WL 1911375, *9.

 Here, Jazikoff alleges myriad actions that an employee would likely find objectionable but none of her allegations, standing on their own, rises to the level of an "adverse employment action." Jazikoff was neither terminated nor suspended. Her allegations of the harassing conduct toward her are not so numerous and severe to permit a factfinder to conclude that she was constructively discharged. Because Jazikoff has failed to submit evidence demonstrating that she suffered retaliatory acts within the meaning of the LAD, the Court need not consider the causation prong of the test and will grant defendants' motion for summary judgment on Count Eight.

*ii. Petition Clause*

As an initial matter, defendants, relying on *Hargrave v. County of Atlantic*, 262

F.Supp.2d 393, 439–40 (D.N.J.2003), argue that plaintiffs' petition clause claims must be dismissed because retaliation claims are the exclusive province of Title VII. Because plaintiffs rely on the filing of their EEOC charges as protected activity, according to defendants, they assert a right that exists only under Title VII. Defendants' reliance on *Hargrave* is misplaced. The *Hargrave* court observed that the cases holding that retaliation claims may only be asserted under Title VII turn "on a finding that the right at issue existed *exclusively* as a creation of Title VII." *Hargrave*, 262 F.Supp.2d at 439–40 (quoting *Bair v. City of Atlantic City*, Nos. 99–5232, 99–5233, 2000 WL 1897391 (D.N.J. June 16, 2000)). The right that plaintiffs assert here is not the right to file an EEOC charge but, rather, the right to petition the government as protected by the First Amendment. That one of plaintiffs' petitions happens to be filed under a Title VII procedure is irrelevant. In any event, both plaintiffs also filed federal complaints and, therefore, the constitutional retaliation claims survive.

 In contrast to the LAD, under the relatively liberal standard for retaliatory conduct under the petition clause, Jazikoff survives summary judgment. It is sufficient for purposes of the petition clause, if retaliatory conduct would "deter a person of ordinary firmness" from exercising her First Amendment rights. *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000). First Amendment retaliation claims may be available even where the retaliatory conduct is relatively minor. "Even an act of retaliation as trivial as failing to hold a birthday party for a public employee, if intended to punish her for exercising her free speech rights" may be actionable. *Citizens for a Better Lawnside v. Bryant*, No. 05–4286(RBK), 2007 WL 1557479, *5, 2007 U.S. Dist. LEXIS

38514, *14–15 (D.N.J. May 24, 2007) (citing *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir.2006)) (internal quotations omitted). Whether the behavior has a coercive quality is also relevant to this inquiry. *See Citizens for a Better Lawnside*, 2007 WL 1557479 at *5, 2007 U.S. Dist. LEXIS 38514 at *15. The standard is objective. *See id.* at *5, 2007 U.S. Dist. LEXIS 38514 at *17.

Based on the myriad instances of harassment and discriminatory application of sick leave and shift change policies, a reasonable juror could conclude that the treatment of Jazikoff would deter a person of ordinary firmness from making complaints.

 Although the allegations as to causation are somewhat thin, Jazikoff has created a genuine issue of material fact as to whether the alleged retaliatory acts were in response to her complaints. Temporal proximity can be helpful in assessing causation under the petition clause but it is not dispositive. When retaliatory action occurs well after protected activity the inference that protected activity was a substantial factor is more difficult to draw but is not foreclosed. *See San Filippo*, 30 F.3d at 444. When a plaintiff is dismissed shortly after final act of protected activity a reasonable juror could infer a connection between the two. *See id.* A petition clause claim gains strength if a plaintiff shows that defendant lacked a pretext. *See id.* The court may look to a range of circumstantial evidence when considering the causal link. *See Farrell v. Planters Life-savers Co.*, 206 F.3d 271, 280–81 (3d Cir. 2000). This evidence may include timing, ongoing antagonism, inconsistent explanations, evidence of retaliatory animus in the intervening period *See id.* (citing relevant case law). But a finding of causation can be based on "other evidence gleaned from the record as a whole." *Id.* at 281.

Jazikoff has introduced evidence after her complaints were filed, she suffered ongoing antagonism from her superiors and co-workers. While temporal proximity alone would not be enough, the number and nature of the alleged acts of retaliation would allow a reasonable conclusion that it was motivated by Jazikoff's complaints. Defendants' motion for summary judgment as to Count Twelve is denied.

#### c. *Ivan*

##### i. *CEPA*

 As noted, Ivan has satisfied the first prong of CEPA by demonstrating that she engaged in protected activity. Ivan has also submitted sufficient evidence of retaliatory conduct for purposes of CEPA. Ivan's suspension in connection with the Smoking Incident was clearly an adverse employment action within the meaning of CEPA. CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19–2(e). However, none of the other purported retaliation qualifies. Adverse employment actions are those final actions which affect plaintiff's compensation or rank. *See Hancock v. Borough of Oaklyn,* 347 N.J.Super. 350, 360, 790 A.2d 186 (App. Div.2002) (citing *Zamboni v. Stamler,* 847 F.2d 73, 82–83 (3d Cir.), *cert. denied,* 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988)). Although actions short of termination may constitute adverse employment actions, "not everything that makes an em-

ployee unhappy" does. *Cokus,* 362 N.J.Super. at 378, 827 A.2d 1173 (internal citations omitted). Actions are not necessarily retaliation solely because "they result in a bruised ego or injured pride on the part of the employee." *Klein v. Univ. of Med. & Dentistry,* 377 N.J.Super. 28, 46, 871 A.2d 681 (App.Div.2005). The purpose of CEPA is prevent retaliatory action not resolve workplace disputes. *Klein* at 45, 871 A.2d 681.

Accordingly, Ivan's CEPA retaliation claim can only be based on her punishment in connection with the Smoking Incident [10] and plaintiffs must sustain their burden of introducing evidence that such punishment was caused by Ivan's complaints. To evaluate causation, the Court must first confront plaintiffs' argument that collateral estoppel should apply to the administrative law judge's determination that such punishment was based on personal animus. Defendant's argue that application of collateral estoppel is inappropriate for two reasons. First, defendants claim that they were not afforded a full opportunity to litigate in the administrative proceeding. Second, defendants argue that the Merit System Board (the "MSB"), which upheld the administrative law judge's determination, did not adopt all of the administrative law judge's findings and, specifically, did not adopt the administrative law judge's determination as to retaliatory animus.

The consequences of applying collateral estoppel to the administrative judge's determination differ with respect to the parties' respective motions for summary judgment. This determination and admin-

---

**10.** Defendants' brief focused exclusively on the determination that Ivan's termination was proper, asserting that Ivan has failed to satisfy her burden of proving that her firing was in response to whistle blowing activity. Specifically, defendants submitted that Ivan was fired because she failed to qualify with her weapon. Without addressing defendants' ar-

guments as to termination, Ivan pointed to retaliation for the Smoking Incident and moved affirmatively for summary judgment, arguing that the administrative law judge's finding that personal animus was the motivating factor in Ivan's punishment for the Smoking Incident is entitled to collateral estoppel treatment.

istrative law judge's related determination that Ivan was properly terminated were procedurally identical. If the administrative law judge's determination with regard to the Smoking Incident is entitled to collateral estoppel, collateral estoppel should also apply to his conclusion that Ivan's termination was proper.[11] If collateral estoppel attaches the determination that Ivan's termination was proper, the Court must grant partial summary judgment to defendants on Ivan's retaliation claims to the extent they are based on the termination because there would remain no genuine issue of material fact as to whether the termination could support a CEPA claim. By operation of collateral estoppel, Ivan's termination would not have been caused by Ivan's whistle-blowing activities and Ivan could not sustain a retaliation claim under any of the retaliation laws. In contrast, even if collateral estoppel attaches with regard to the Smoking Incident, defendant must still demonstrate that there is no genuine issue of material fact with regard to each CEPA element.

■ "A party is precluded by collateral estoppel from relitigating matters or facts which the party actually litigated and which were determined in a prior action, involving a different claim or cause of action, and which were directly in issue between the parties." *Zoneraich v. Overlook Hosp.*, 212 N.J.Super. 83, 93, 514 A.2d 53 (App.Div.1986) *cert. denied* 107 N.J. 32, 526 A.2d 126 (1986). "Adjudicative determinations by administrative tribunals are entitled to preclusive effect if rendered in proceedings meriting that deference. It is no objection that the administrative decision was subjected only to a lenient standard of review." *Id.* at 94, 514 A.2d 53 (internal citations omitted).

The New Jersey Supreme Court has held that in order to apply collateral estoppel a previous determination must meet the following criteria: (i) the issue is identical to the issue decided in earlier proceeding; (ii) the issue was actually litigated in a earlier proceeding; (iii) the court issued a final judgment on the merits; (iv) the determination was essential to the earlier judgment; and (v) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding. *See In re Estate of Dawson,* 136 N.J. 1, 20–21, 641 A.2d 1026 (1994).

■ Before applying collateral estoppel a court must determine that equity permits it. *See Pace v. Kuchinsky,* 347 N.J.Super. 202, 215, 789 A.2d 162 (App. Div.2002). New Jersey courts have recognized five equitable exceptions to collateral estoppel identified in the Restatement (Second) of Judgments. *Ensslin v. Township of North Bergen,* 275 N.J.Super. 352, 370, 646 A.2d 452 (App.Div.1994) *cert. denied* 142 N.J. 446, 663 A.2d 1354 (1995) (citing *Zoneraich,* 212 N.J.Super. at 94, 514 A.2d 53).

(1) "The party against whom preclusion is sought could not, as a matter of

---

**11.** As plaintiffs point out, defendants in their Brief in Support of Defendants, County of Middlesex, Middlesex County Sheriff's Department and Sheriff, Middlesex County's Motion for Summary Judgment (the "Corson Brief") make an argument that is in logical opposition to the argument asserted in this context. Specifically, defendants argue there that Ivan's retaliation claim is barred by the doctrine of res judicata based on the administrative judge's determination that Ivan's firing was due to a failure to qualify on her weapon, asserting that "collateral estoppel applies for administrative hearings for agencies acting in a judicial capacity resolving disputed issues where the party had an opportunity to litigate." (Pl.'s Reply 8 (citing Corson Brief 4–10).) In the Corson Brief defendants argue that because Ivan participated in hearing, presented evidence and was given an opportunity to testify under oath and confront witnesses, collateral estoppel applies. (*Id.*)

law, have obtained review of the judgment in the initial action; or

(2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws;

(3) A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them; or

(4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a significantly heavier burden than he had in the first action; or

(5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action."

Restatement (Second) of Judgments § 28 (1982).

With regard to the County and the Department, collateral estoppel effect should apply to the ALJ determination that the punishment for the Smoking Incident was motivated by personal animus. Spicuzzo, however, should not be estopped because he was not a party to the original proceeding. The issue decided in the ALJ proceeding was whether the 30–day suspension was the result of personal animus, the identical issue involved in assessing causation under CEPA. Defendants' argument that not all of the CEPA factors were at issue is misplaced. Not all the CEPA elements need have been at issue in the ALJ proceeding in order for collateral estoppel to apply to the ALJ determination. As discussed, application of collateral estoppel to the ALJ determination with regard to the Smoking Incident does not mandate summary judgment on Ivan's entire CEPA claim. Collateral estoppel acts to bar a party from re-litigating an *issue* not from litigating any claim of which that issue may form an element.

Second, this issue was actually litigated in an earlier proceeding. The ALJ made clear to the parties that the motive behind the suspension was clearly at issue, advising counsel:

> ... we were talking about retaliatory motive from his perspective, your justification for not being a retaliatory motive, and if I said anything with respect to retaliatory motive, that's in play. All right. It's in play, and your ability to defend against retaliatory motive is also in play.

(Certification of John P. Nulty, Jr. (Dkt. No. 136 (filed Jan. 31, 2008)) ("Nulty Supp. Cert."), Ex. Q at 22.) Each party was then on notice to litigate the issue of retaliatory motive and there is no evidence that the County or Department failed to vigorously litigate such issue. To the contrary, it appears that both parties contested the

ALJ proceeding. (Pls.' Reply 10–11; Defs.' Opp. 9–12.)

Third, the MSB issued a final judgment on the merits. Although defendants argue that the MSB did not fully adopt the administrative law judge's findings of fact and, therefore, the findings of fact were not part of the final determination of the MSB, the record simply does not support this characterization. The MSB "... accepted and adopted the Findings of Fact and Conclusion as contained in the initial decision and the ALJ's recommendations to reverse the 30–day suspension and uphold the removal." (Nulty Supp. Cert, Ex. Q at 1.) To be clear, the Court does not conclude that such personal animus itself arose because of Ivan's whistle blowing activities, just that Spicuzzo filed the action because of personal animus for Ivan. A reasonable jury might infer that this animus arose because of Ivan's complaints but the ALJ's determination did not encompass such an inference.

Fourth, the determination of retaliatory motive was essential to the ALJ's determination. This the ALJ made clear to the parties at the outset. By showing that her punishment for the Smoking Incident was motivated by personal animus Ivan was able to demonstrate that the reasons proffered by the Department for her suspensions were pretextual.

Fifth, at least with regard to the County and Department, defendants were party to the prior proceeding and the Department had a clear continuity of interest with the County. *See Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 n. 4 (3d Cir. 1997) (treating a municipality and its police department as one entity).

■ Application of collateral estoppel is equitable because none of the exceptions to the general rule apply here. The first exception does not apply because there were two levels of review. The initial determination of the ALJ was appealable to the MSB and findings and conclusions of the MSB are reviewable by the Appellate Division of the Superior Court of New Jersey. *See, e.g., Costantino v. New Jersey Merit System Board*, 313 N.J.Super. 212, 712 A.2d 1158 (App.Div.1998); *In re Taylor*, 158 N.J. 644, 655–56, 731 A.2d 35 (1999). Having concluded that the ALJ determination as to personal animus was a final determination, the Court need not entertain defendants' argument that this exception should apply because only final determinations are appealable.

The second exception does not apply because there has been no change in the underlying legal principles and, in any event, the issue was primarily one of fact and not of law.

The third exception is a closer call but the Court is confident that under New Jersey law the process afforded defendants in the ALJ proceeding is comparable in quality and extensiveness to the process that would be available in this Court. Defendants primary objection is that Ivan was allowed to read from the deposition of sheriff's officer Alteria, depriving the County's counsel of an opportunity to cross-examine. (Defs.' Opp., Ex. B.) New Jersey courts have recognized application of collateral estoppel to agency determinations in state retaliation cases. *See, e.g., Hennessey v. Winslow Township*, 183 N.J. 593, 875 A.2d 240 (2005); *Ensslin*, 275 N.J.Super. 352, 646 A.2d 452. Although plaintiffs argue that the rules applied by the administrative law judge are the same rules applied in *Ensslin*, there is no indication that hearsay evidence was admitted in that case. In any event, the administrative judge did not rely on this evidence in reaching his determination, concluding that personal animus of Spicuzzo was a motivating factor because "[t]he explanations given by the Sheriff and Chief Alma-

sy ... were ludicrous and nonsensical." (Nulty Supp. Cert., Ex P at 45.) The introduction of the deposition testimony of officer Alteria did not contribute to this finding.

The fourth exception does not apply because the County bore the same burden of persuasion in the ALJ proceeding as it would in a CEPA proceeding. Once a plaintiff makes a prima facie showing, the burden shifts to the defendant to demonstrate that there was a legitimate reason for the adverse employment action. *See Blackburn v. United Parcel Service*, 179 F.3d 81, 92 (3d Cir.1999); *Bowles v. City of Camden*, 993 F.Supp. 255, 261–62 (D.N.J. 1998); *Kolb*, 320 N.J.Super. at 479, 727 A.2d 525. In the ALJ proceeding the County bore the same burden.

Finally, the fifth exception does not apply because there is no potential impact on the public interest. Only the interests of the parties to the present case are at stake. It was clearly foreseeable that the determinations of the ALJ might arise in a later proceeding. To reiterate, the County and Department had a full opportunity to litigate the issue.

Ultimately, the Court is convinced that collateral estoppel should apply because this case is so similar to *Ensslin*. In *Ensslin*, the plaintiff, a police officer in the Township of North Bergen who was rendered paraplegic by a skiing accident, challenged his termination in an administrative proceeding before an administrative law judge. The administrative law judge determined that his termination was proper because the plaintiff was incapable of performing his duties of a police officer. *Ensslin*, 275 N.J.Super. at 358–61, 646 A.2d 452. The MSB adopted the administrative law judge's findings of fact. The Law Division upheld the MSB determination on summary judgment grounds. The

*Ensslin* court upheld but on the ground of issue preclusion. *Id.* at 369, 646 A.2d 452.

Defendants, relying on *Hennessey*, attempt to frame the issue as whether a defendant should be precluded in a later federal suit solely because the plaintiff elected to pursue an administrative proceeding. The *Hennessey* court held that a plaintiff should not be precluded from bringing an LAD claim in Superior Court after the plaintiff initially proceeded via an administrative process but abandoned such process before appealing to the MSB. *Hennessey*, 183 N.J. at 602, 875 A.2d 240. *Hennessey* can be distinguished. The reasoning underpinning the *Hennessey* court's decision was that plaintiff had a right to elect which remedy she wished to pursue. The *Hennessey* court held that the plaintiff could abandon her administrative claim before review by the MSB in favor of the Superior Court because there had not yet been a determination on the merits. *Id.* at 604, 875 A.2d 240. No MSB determination had been made when the *Hennessey* plaintiff brought suit in Superior Court. *Id.* Here, the MSB upheld the administrative judge's decision. Moreover, to the extent that defendants read equitable considerations into the *Hennessey* court's holding, that equity would not stretch so far as to encompass the Department. Defendants have no right to elect remedies under the administrative appeal process and it is hardly unfair for the defendants to proceed under the administrative process.

▬▬▬▬ The above analysis applies to Spicuzzo with one important exception. Spicuzzo did not have the benefit of representation by counsel. Because Spicuzzo was not a party to the proceeding, collateral estoppel applies only if Spicuzzo had privity or an identity of interest with the Department. Solely because parties have similar interests in the outcome of a litiga-

tion does not establish privity for purposes of collateral estoppel. *See In re Dawson,* 136 N.J. at 22, 641 A.2d 1026. Application of collateral estoppel to Spicuzzo is inappropriate because his interests were not perfectly aligned with that of the County or Department. *See id.* (application of collateral estoppel is inappropriate if "it shall affirmatively appear in the action that there exists a conflict of interest between the persons so joined and the persons not joined."). Because personal animus might tend to suggest willful indifference to Ivan's complaints, the administrative judge's determination could support individual liability for Sheriff Spicuzzo. Accordingly, Spicuzzo is not estopped from contending that the punishment for the Smoking Incident was motivated by personal animus.

■■■ Because the Court concludes that collateral estoppel is appropriate, the County and Department are estopped in the present matter from contending that the Smoking Incident was not motivated by personal animus. This is not to say that plaintiffs are entitled to summary judgment on Ivan's CEPA claim. Although, plaintiffs have shown that Ivan's punishment in connection with the Smoking Incident was motived by personal animus, plaintiffs have failed to demonstrate that there is no genuine issue of material fact as to all the elements of CEPA. A plaintiff must prove four elements of her CEPA claim: (1) that the plaintiff reasonably believed that employer's conduct violated a law or regulation; (2) that the plaintiff performed "whistle-blowing activity" as defined in CEPA; (3) that an adverse employment action has been taken against him or her; and (4) that the whistle-blowing activity caused such adverse employment action. *Kolb,* 320 N.J.Super. at 476, 727 A.2d 525; *Dzwonar,* 177 N.J. at 462, 828 A.2d 893.

Plaintiffs' motion for summary judgment fails on causation. The filing of EEOC charges and the federal complaint both occurred after Sheriff Spicuzzo submitted his initial report. So only the written complaints could constitute protected activities. The written complaints occurred almost a year and a half before Spicuzzo submitted the report on the smoking incident. There is nothing more in the record tying Spicuzzo's personal animus to these written reports and, given the significant time lag between the protected activity and the purported reprisal, more is needed to foreclose any reasonable conclusion that the two were not connected.

This is not to say that defendants' motion for summary judgment must be granted. The factual record contains support for a reasonable inference that the punishment was caused by Ivan's whistle-blowing activity as well as a reasonable inference that it was not. Whether it was in fact is for the jury to decide. It follows that both plaintiffs' and defendants' motions for summary judgment with regard to Count Fifteen must be denied.

■■■ Defendants assertion that CEPA does not impose individual liability on employees and supervisors is not supported by the case law or the statutory text. CEPA imposes liability on a "person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." N.J. Stat. Ann. 34:19–2(a). CEPA also imposes individual liability upon retaliatory parties who act with the authorization of their employers. *See Palladino v. VNA of Southern New Jersey, Inc.,* 68 F.Supp.2d 455, 471–74 (D.N.J.1999); *see also Espinosa v. Continental Airlines,* 80 F.Supp.2d 297, 306 (D.N.J.2000). Defendants argument is based entirely on the New Jersey Supreme Court's refusal to disturb dismissal by a trial court of claims against

individual employees under CEPA. *See Higgins v. Pascack Valley Hosp.,* 158 N.J. 404, 730 A.2d 327 (1999). This purported holding in *Higgins* was dealt with squarely in *Palladino.* Because the *Higgins* court decided individual liability could not be imposed on the facts, the *Palladino* court concluded that *Higgins* actually supported the existence of individual liability. *See Palladino,* 68 F.Supp.2d at 473–74. Because Spicuzzo could be held individually liable under CEPA defendants' motion for summary judgment must fail.

### *ii. Petition Clause*

As with Jazikoff, there is no serious contention that Ivan's complaint were not constitutionally protected activity. Additionally, because the retaliation against Ivan included a suspension, plaintiffs have clearly introduced evidence of a retaliatory act. Plaintiffs run into some difficulty on causation, however. The alleged retaliation occurred several months after Ivan filed her complaint. But lack of temporal proximity is not dispositive. Because defendants are estopped from contesting the administrative judge's determination that personal animus was at play in Ivan's punishment for the Smoking Incident a reasonable juror could conclude that such punishment was retaliation for Ivan's complaints. Defendants motion for summary judgment as to Count Eleven is denied.

In summary, the Court grants defendants' motion for summary judgment on plaintiffs' LAD retaliation claims. The Court denies defendants' motion for summary judgment on plaintiff Ivan's CEPA claim and on the petition clause claims. Finally, the Court denies in part and grants in part plaintiffs' motion for summary judgment on Ivan's CEPA claim.

### *Counts Nine & Ten: Equal Protection*

The Court addresses next plaintiffs' section 1983 claims against the County, De-partment, and individual defendants. Plaintiffs claim that the County and Department violated their equal protection rights in the following ways: (1) by requiring that officers of the same sex transport and search prisoners of the same sex, (2) by failing to train, discipline or control the individual defendants who sexually discriminated and harassed plaintiffs. Plaintiffs assert that individual defendants are each individually liable under section 1983.

The County, Department and each individual defendant has moved for summary judgment with respect to each plaintiff's § 1983 cause of action.

### *1. Individual Liability under Section 1983*

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983. Only purposeful discrimination is actionable under section 1983. *See Keenan v. City of Philadelphia,* 983 F.2d 459, 465 (3d Cir.1992);

To impose individual liability under § 1983 for equal protection violations, the defendants must have been personally, affirmatively involved in the alleged wrongdoing. *See C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 173 (3d Cir. 2005); *see also Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1293 (3d Cir.1997), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Each Plaintiff must prove that the individual defendants personally participated in violating her rights, or that they directed others to violate

them, or that they had knowledge of and acquiesced in their subordinates' violations. *See Robinson,* 120 F.3d at 1293 (quoting *Baker v. Monroe Twp.,* 50 F.3d 1186, 1190–91 (3d Cir.1995)). A harasser who has no formal or de facto supervisory authority over plaintiff cannot be held liable under section 1983 because the requisite element of state action is lacking. *See Zelinski v. Pa. State Police,* 108 Fed.Appx. 700, 703 (2004). But the harasser's supervisor may be held liable if the supervisor had knowledge of the harassment and acquiesced in his or her subordinates' wrongful acts. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478–79 (3d Cir.1990).

■■■ Here, plaintiff Ivan has produced evidence that she was harassed by Allen on the basis of her gender. Likewise, plaintiff Jazikoff has presented evidence that Blount harassed her because of her gender. Both plaintiffs have also presented evidence that incidents of harassment occurred when Allen and Blount had de facto or formal supervisory authority over Ivan and Jazikoff respectively. Therefore, plaintiffs have raised a genuine issue of material fact as to whether their constitutional rights have been violated by the actions of Allen and Blount respectively.

■■■ In contrast, plaintiff Jazikoff has not presented any evidence that Landis and Pepenella had any supervisory authority, formal or otherwise, over her. Because they lacked supervisory authority, their actions cannot be said to be under "color of state law." *See Zelinski,* 108 Fed.Appx. at 703. Although harassing conduct of Landis and Pepenella may be relevant to Jazikoff's claim against Blount for his acquiescence in his subordinates' wrongdoing, Landis and Pepenella cannot be individually liable under section 1983. Accordingly, the Court grants summary judgment on Jazikoff's section 1983 claims against Landis and Pepenella.

■■■ The evidence in the record raises a genuine issue of material fact with respect to whether Spicuzzo and Falcone were aware of Allen's conduct toward Ivan and failed to prevent such action. As detailed earlier, despite a recommendation for punishment, Allen was not disciplined but was instead told by Undersheriff Falcone that Sheriff Spicuzzo had decided not to take any action against him. (Nulty Cert., Ex. JJ at 349:25–350:9.) Based on this evidence, a reasonable jury could infer that Sheriff Spicuzzo and Undersheriff Falcone knew and acquiesced in Allen's wrongful conduct toward Ivan.

Plaintiffs also produced evidence that after Jazikoff met with the County's personnel department to report the various incidents of sexual harassment, Undersheriff Falcone berated Jazikoff and was hostile toward her. (Nulty Cert., Ex. K at 5–6.) This evidence is sufficient to raise a genuine issue of material fact as to whether Falcone was personally involved in violating Jazikoff's right to equal protection.

■■■ In contrast, Jazikoff does not allege, much less produce evidence, that Spicuzzo was in any way involved in the sexual harassment she claims to have experienced. Nor has Jazikoff referred to any evidence which establishes, with "appropriate specificity," that Spicuzzo personally directed or had actual knowledge of the sexual harassment allegedly directed at plaintiff by Blount, Landis and Pepenella. Accordingly, the Court will enter summary judgment with respect to Jazikoff's section 1983 claim against Spicuzzo.

*a. Qualified Immunity*

■■■■ Defendants contend that even if there are disputes of fact as to whether plaintiffs' rights to equal protection have been violated, they cannot be held liable because they are entitled to

qualified immunity. Defendants' argument is without merit. A public official's actions are protected by qualified immunity if he or she can show that the "offending" conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Contrary to defendants' assumption that plaintiffs are asserting a due process right, the right at issue in this case is a right to be free of discrimination based on sex in the workplace, a right grounded in the equal protection clause of the Fourteenth Amendment. The Third Circuit has held that the right to be free from sexual harassment and discrimination "was well grounded in law and widely known to the public by 1986." *Andrews,* 895 F.2d at 1479 (denying qualified immunity to city officials for sexual harassment on this ground). Accordingly, the Court holds that Spicuzzo, Falcone, Allen, and Blount are not protected by qualified immunity in treating, or allowing their subordinates to treat, female employees differently on the basis of their gender.

In summary, with respect to Jazikoff's section 1983 claims, the Court grants Spicuzzo's, Landis's and Pepenella's motions for summary judgment and denies Blount's and Falcone's motions. As to Ivan's section 1983 claims, the Court denies Spicuzzo's, Falcone's and Allen's motions for summary judgment.

2. *County and Department*

 To subject a governmental entity to liability, the constitutional deprivation must result from an official custom or policy. *See Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). An official custom is "such practices of state officials … so permanent and well settled as to constitute

a 'custom or usage' with the force of law." *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1059 (3d Cir.1991) (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." *Id.* (citations omitted).

 No municipal liability will arise solely because it employs a tortfeasor; in other words, a municipality will not be held liable under section 1983 on a theory of *respondeat superior. See Monell,* 436 U.S. at 691, 98 S.Ct. 2018. A municipality's failure to train state actors will only give rise to a constitutional tort when that failure amounts to deliberate indifference to the rights of persons with whom they come into contact. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Deliberate indifference exists if the challenged act implements a municipal policy or custom. *See Bonenberger v. Plymouth Twp.,* 132 F.3d 20, 25 (3d Cir. 1997). Accordingly, deficient training, discipline or control of municipal officials may form a basis for municipal liability under section 1983 only if plaintiff can show "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Id.* (quoting *Freedman v. City of Allentown,* 853 F.2d 1111, 1117 (3d Cir.1988)).

Plaintiffs claim that the Department's written and unwritten policies intentionally and facially discriminate based on gender. In support, plaintiffs point to the following evidence. General Orders 60:4.4 and 6:11.2 require that a prisoner be searched and transported by officers of the same sex of the prisoner whenever possible.

(Murphy Report at 6.) By departmental custom, female officers cannot be partnered together and a female officer must be on duty for every shift. (Murphy Report at 10–11.) In addition, the Department maintains a separate overtime list for male and female officers and places limitations on switching shifts by female officers. (*Id.*) Plaintiffs contend that these policies negatively affected the conditions of employment for the female officer because they were more restricted from changing shifts and were compelled to work a disproportionate amount of mandatory overtime shifts as compared to male officers. In addition, Sheriff Spicuzzo stated that gender played a role in determining how posts in the Department were filled and that female officers more qualified than male officers had been denied opportunities. (Nulty Cert., Ex. X Spicuzzo Dep. 63:24–64:18.) Plaintiff Jazikoff was advised that she would not need the training given to all other new officers in all divisions of the Department because she would be limited to working in the Transportation Division. (Nulty Cert., Ex. K Jazikoff Aff. ¶ 4.)

Defendants do not appear to dispute that the Department's policies and practices are facially discriminatory. They instead assert that its discriminatory staffing policy is justified as a bona fide occupation qualification ("BFOQ").

 Title VII does not prohibit sex-based discrimination when sex is a bona fide occupational qualification reasonably necessary to the normal operation of a particular business or enterprise. *See* 42 U.S.C.2000e–2(e)(1). The so-called "BFOQ" defense is to be read narrowly. *See Int'l Union v. Johnson Controls, Inc.,* 499 U.S. 187, 204, 111 S.Ct. 1196, 1206, 113 L.Ed.2d 158 (1991); *Dothard v. Rawlinson,* 433 U.S. 321, 333, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128, 132 (3d Cir.1996). The Supreme Court has held that sex-based discrimination is permissible only with regard to aspects of a job that "fall within the 'essence' of the particular business." *Johnson Controls,* 499 U.S. at 206, 111 S.Ct. 1196. The employer bears the burden of establishing the BFOQ defense. *See id.* at 221–22, 111 S.Ct. 1196. A defendant employer can satisfy its burden of proof only by proving that they had a factual basis for believing that no members of one sex could perform the job in question. *See Healey,* 78 F.3d at 132.

 As an initial matter, neither party has briefed the Court on the question of whether the BFOQ defense, a statutory defense against Title VII claims, can defeat a section 1983 claim. Even if the Court assumes for purposes of this motion that the BFOQ defense does apply, defendants have not sustained their burden.

Defendants point to the need of the department to transport female prisoners from and to the courthouse and to search them as needed. Defendants argue that the gender-specific assignment is necessary to protect the prisoners' privacy.[12] The Defendants also refer to several provisions in the New Jersey Administrative Code and a New Jersey statute governing segregation of prisons and search of prisoners.[13] As example, the New Jersey Ad-

---

**12.** Sheriff Spicuzzo and Undersheriff Falcone have testified that the sole reason for having female officers search and transport female prisoners is to protect male officers from lawsuits. (Nulty Cert., Ex. W, Falcone Dep. 92:5–93:1; Ex. X Spicuzzo Dep. 208:6–210:8.)

**13.** New Jersey law requires that the Sheriff "appoint one or more female guard or guards [sic] over such female prisoners at all hours during the night." N.J. Stat. Ann. 30:8–12. As plaintiffs point out, this statute is inapplicable because the female sheriff's officers

ministrative Code requires that strip searches be conducted by a guard of the same sex as the prisoner. *See, e.g.*, N.J. Admin. Code 10A:3–5.7. In contrast, an adjacent provision in the Code explicitly provides that "pat searches may be conducted by either male or female custody staff members regardless of the gender of the inmate." N.J. Admin Code 10A:3–5.6(d). Defendants have not offered any evidence that indicates how often strip searches are conducted during processing and transport of prisoners. If strip searches are conducted frequently, it may be that the presence of a female officer would be necessary at all times. If, however, strip searches are isolated occurrences, the department could achieve its purpose of protecting the privacy of the prisoner by calling a female officer when the need arises. In short, Defendants have not shown that they could not reasonably arrange job responsibilities in a way to minimize a clash between the privacy interests of the prisoners, and the non-discriminatory principle of the Equal Protection Clause. *See Healey*, 78 F.3d at 132.

As further support of the validity of the BFOQ defense, defendants point to the New Jersey Division of Equal Employment Opportunity and Affirmative Action ("EEO/AA")'s approval of the Department's application to make certain Sheriff's Officer positions female only ("BFOQ application").[14] Defendants urge that the Court defer to this determination by the state agency, citing cases in which the courts accorded deference to agency determinations when reviewing their decisions. However, the decision of EEO/AA is not being reviewed by this Court for affirmance or reversal. It is simply an item of

evidence that the Court may consider in review of all the other pertinent facts of this case for purposes of this motion. As said earlier, defendants have not presented enough evidence to sustain their burden of establishing the BFOQ defense. Moreover, plaintiffs have submitted evidence which undermines the reliability of the BFOQ application. The Court therefore denies the County and the Department's motion for summary judgment on plaintiffs' section 1983 claims.

***Counts Thirteen & Fourteen: Conspiracy***

In counts Thirteen and Fourteen plaintiffs seek damages under 42 U.S.C. § 1983 and § 1985(3) for an alleged constitutional conspiracy by the defendants. Although both the plaintiffs and Defendants have only briefed the merits of the § 1985(3) conspiracy claim the Court also considers the merits of the § 1983.

*1. Standard*

To demonstrate an unconstitutional conspiracy a plaintiff must show that two or more conspirators reached an agreement to deprive the plaintiff of a constitutional right under color of state law. *See Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392 (3d Cir.2003). In order to establish a § 1983 conspiracy claim a plaintiff must show "(1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right." *Williams v. Fedor*, 69 F.Supp.2d 649, 665 (M.D.Pa.1999), *aff'd* 211 F.3d 1263 (3d Cir.

here were not female guards in a prison under Sheriff Spicuzzo's jurisdiction.

**14.** The BFOQ application was submitted on June 3, 2003, about 50 days after this suit was filed.

2000) (quoting *Kerr v. Lyford,* 171 F.3d 330, 340 (5th Cir.1999)). To sufficiently plead a § 1985(3) claim a plaintiff must establish "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Farber v. City of Paterson,* 440 F.3d 131, 134 (3d Cir.2006) (quoting *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)).

■■■ A claim for conspiratorial liability "must ... contain supportive factual allegations." *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989). The factual allegations supporting the conspiracy claim may not be generalized or conclusory. *See id.*; *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1377 (3d Cir.1992), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *Durre v. Dempsey,* 869 F.2d 543, 545 (10th Cir. 1989). The Third Circuit has provided further guidance in the RICO context by noting that "[t]o plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1166 (3d Cir.1989) *abrogated on other grounds by Beck v. Prupis,* 529 U.S. 494, 505–06, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000); *see also Smith v. Bacon,* 699 F.2d 434, 436–37 (8th Cir.1983) (plaintiff must allege facts showing a "meeting of the minds"); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990) ("It is incumbent on a plaintiff to state more than conclusory alle-

gations to avoid dismissal of a claim predicated on a conspiracy to deprive him of his constitutional rights"); *Snell v. Tunnell,* 920 F.2d 673, 702 (10th Cir.1990) *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991) ("The participants in the conspiracy must share the general conspiratorial objective.... To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was 'a single plan, the essential nature and general scope of which [was] know[n] to each person who is to be held responsible for its consequences.' ") (quoting *Hoffman–La Roche, Inc. v. Greenberg,* 447 F.2d 872, 875 (7th Cir.1971)). The Third Circuit clearly stated that this heightened pleading requirement applies to both § 1983 and § 1985(3) conspiracy claims. *See Startzell v. City of Philadelphia,* 533 F.3d 183, 205 (3d Cir.2008) (stating that in order to support a § 1983 or a § 1985(3) claim plaintiff must show a "meeting of the minds") (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

*2. Analysis*

■■■ Plaintiffs have failed to support their constitutional conspiracy claims with sufficient factual allegations. Plaintiffs' complaint contains bare allegations of a conspiracy to discriminate without specific factual allegations identifying the conspirators or the particular actions taken by the conspirators to accomplish their discriminatory goal. At most, plaintiffs make broad allegations that the entire "Sheriff's Department proffered false testimony from a Superior Officer" without identifying the specific departmental officers involved or the conspiracy associated with the alleged false testimony. (*See* Second Am. Compl. ¶ 122.)

Plaintiffs' subsequent pleadings and opposition briefing do not remedy this fatal

lack of specificity. Plaintiffs merely repeat and defend their broad allegations of a department-wide conspiracy without referring to additional facts which could reasonably support an inference that such a conspiracy existed. Plaintiffs further complicate the issue by asserting an additional conspiracy in their opposition brief regarding the "BFOQ application" which plaintiffs claim was generated by the Sheriff's department to "manufacture a defense" based upon "plagiarized" and unsupported information. (*See* Defs.' Opp. 80). Plaintiffs single out Sergeant Sathan and Director Cross as participating in this alleged conspiracy but fail to allege any specific facts from which this Court can infer that a "meeting of the minds" occurred and that Sathan, Cross or any other department officials were acting to further an agreed upon conspiracy. Moreover, the unlawful conduct surrounding the BFOQ application is alleged to have occurred after the period of discrimination which forms the basis of plaintiffs' claims. It is unclear how this conspiracy, even if it were supported by the facts, would support plaintiffs' section 1983 and section 1985(3) claims. Accordingly, the Court grants summary judgment to all defendants on Counts Thirteen and Fourteen.

## CONCLUSION

For the preceding reasons, defendant's motion for summary judgment is granted in part and denied in part. Plaintiffs' motion for summary judgment is denied.

## ORDER

Defendants County of Middlesex; Middlesex County Sheriff's Department; Sheriff Joseph C. Spicuzzo, Undersheriff Angelo Falcone, Lieutenant Donald Blount, Sergeant Bruce Allen, Officer Robert Landis, Officer Alexander Pepenella have moved for summary judgment. Plaintiffs Joan Ivan and Angel Jazikoff have moved for summary judgment on Count Fifteen. The Court has considered the moving and opposition papers. For the reasons given in the accompanying opinion:

It is on this 21st day of January, 2009,

ORDERED that defendants' motion for summary judgment is GRANTED in part and DENIED in part; it is further

ORDERED that plaintiffs' claims against Defendants Landis and Pepenella are hereby DISMISSED with prejudice; it is further

ORDERED that defendants' motion for summary judgment as to Counts One, Two, Three and Four against Defendants County of Middlesex and Middlesex County Sheriff's Department is DENIED; it is further

ORDERED that defendants' motion for summary judgment as to Counts One, Two, Three and Four against Defendants Spicuzzo, Falcone, Blount and Allen is GRANTED; it is further

ORDERED that plaintiffs' claims in Counts One, Two, Three and Four against Defendants Spicuzzo, Falcone, Blount and Allen are hereby DISMISSED with prejudice; it is further

ORDERED that defendants' motion for summary judgment as to Counts Five and Six against Defendants Sheriff Spicuzzo, Undersheriff Falcone, Lieutenant Blount and Sergeant Allen is DENIED; it is further

ORDERED that defendants' motion for summary judgment as to Counts Seven and Eight is GRANTED; it is further.

ORDERED that plaintiffs' claims in Counts Seven and Eight are hereby DISMISSED with prejudice; it is further

ORDERED that defendants' motion for summary judgment as to Count Nine is DENIED; it is further

ORDERED that defendants' motion for summary judgment as to Count Ten is DENIED in part and GRANTED in part; it is further

ORDERED that plaintiff Jazikoff's claim in Count Ten against Defendant Spicuzzo is hereby DISMISSED with prejudice; it is further

ORDERED that defendants' motion for summary judgment as to Counts Eleven and Twelve is DENIED; it is further

ORDERED that defendants' motion for summary judgment as to Counts Thirteen and Fourteen is GRANTED; it is further

ORDERED that plaintiffs' claims in Counts Thirteen and Fourteen are hereby DISMISSED with prejudice; it is further

ORDERED that defendants' motion for summary judgment as to Count Fifteen is DENIED; it is further

ORDERED that plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part.